888 A.2d 441

I/M/O FRESHWATER WETLANDS STATEWIDE
GENERAL PERMITS.

Argued September 27, 2005—Decided January 11, 2006.

454

*Susan J. Kraham,* Staff Attorney, Rutgers Environmental Law Clinic, argued the cause for appellants, Preserve Old Northfield, Karen Davis, Terry Davis, Evelyn Jaffe, Herbert Jaffe, Sue Jager, Steven Jager, Joanne Jones, Steven Jones, Andrea Lawrence, Dana Miller, Michael Miller, Edith Scharfstein, Sol Scharfstein, Joyce Kleinberg, Neal Simon, Al Stoloff, Jean Stoloff, Beth Waldron, Bob Waldron, Gail Winard, Ted Winard, Phyllis Kalfus, Ronald Kalfus, Dot Beller, Gerry Beller, Medley Christopher, Chris Christopher, Joan Gruber, Charles Gruber and Joan Simms.

*A. Colleen Malloy,* Deputy Attorney General, argued the cause for respondent, New Jersey Department of Environmental Protection (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel; *Ms. Malloy* and *Lisa A. Runyon,* Deputy Attorney General, on the briefs).

*Ronald P. Heksch* submitted a brief on behalf of amicus curiae, New Jersey Builders Association (*Giordano, Halleran & Ciesla,* attorneys; *Mr. Heksch* and *Paul H. Schneider,* of counsel).

Justice ALBIN delivered the opinion of the Court.

Maramark Builders, L.L.C., owns a seven-acre wooded and undeveloped piece of property in Livingston Township on which it intends to build single-family residences. While seeking subdivision approval from the Livingston Township Planning Board, Maramark applied to the Department of Environmental Protection (DEP or Agency) for a freshwater wetlands permit to fill a portion of "isolated" wetlands on that property, pursuant to the Freshwater Wetlands Protection Act (FWPA), *N.J.S.A.* 13:9B–1 to –30. Petitioners are property owners and a community organization named Preserve Old Northfield (POND) who object to the issuance of the permit on the ground that the wetlands are not

"isolated" and that filling them will exacerbate flooding conditions on their adjoining properties.

The DEP extensively examined the wetlands issue over a two-year period. The Agency considered the objectors' letters and environmental expert reports; conducted on-site inspections; and met with neighboring property owners, their expert, and their lawyers. At the end of that review process, the DEP issued Maramark a freshwater wetlands permit.

Before and after the DEP's issuance of the permit, the neighbors demanded a trial-type hearing before the Office of Administrative Law (OAL). The DEP responded that the neighbors had no statutory or constitutional right to such a hearing as part of the administrative permitting process. The Appellate Division concurred, finding that the neighbors' speculative claims of increased flooding did not give rise to a property interest cognizable under the federal or state constitution. Accordingly, the Appellate Division upheld the DEP's decision to deny the objectors an adversarial, adjudicatory hearing before an administrative law judge.[1]

We affirm. The DEP's administrative review procedures for the issuance of a freshwater wetlands permit satisfied traditional notions of due process. The grant of a freshwater wetlands permit is only one part of a comprehensive land-use review process. In this case, the Planning Board has statutory responsibility to determine the adequacy of Maramark's proposed drainage system. For that reason, the neighbors' fear of flooding from the issuance of a wetlands permit is too speculative to establish a property right entitling them to a trial-type hearing.

---

[1] In a separate appeal the Appellate Division provided relief to the neighboring property owners by setting aside the freshwater wetlands permit and remanding to the DEP for further factfinding. *In re Authorization for Freshwater Wetlands Gen. Permits, Water Quality Certification & Waiver of Transition Area for Access,* 372 *N.J.Super.* 578, 598, 860 A.2d 450 (App.Div.2004). That matter is not before us.

The speculative nature of the objectors' fear is borne out by the proceedings before the Livingston Township Planning Board.[2] There, at trial-type hearings, the objectors testified and presented expert testimony in opposition to Maramark's subdivision application. After more than a dozen days of hearings, the Board denied subdivision approval, in part because of Maramark's failure to present sufficient evidence of compliance with the State's Stormwater Management Rules.

## I.

### A.

In February 2001, Maramark filed an application with the Township Planning Board for subdivision approval for construction of eleven single-family homes off of West Hobart Gap Road in Livingston. The undeveloped property, which is wooded and contains wetlands, borders the backyards of a number of single-family homes. At the same time that it sought subdivision approval, Maramark applied to the DEP for a Letter of Interpretation (LOI) and a Statewide Freshwater Wetlands General Permit Number 6 (GP–6) to fill two "isolated" wetlands totaling 0.19 acre on its property. *See N.J.S.A.* 13:9B–8, –23. The purpose of an LOI is to determine whether a particular tract of property contains wetlands and, if so, to ascertain the extent and value of the wetlands and the degree of protection to which they are entitled under the FWPA. *N.J.S.A.* 13:9B–8; *N.J.A.C.* 7:7A–1.4; *N.J.A.C.* 7:7A–3.1(a). A GP–6 permit authorizes a property owner to fill a limited area of freshwater wetland, provided that wetland is isolated and "not part of a surface water tributary system discharging into an inland lake or pond, or a river or stream." *N.J.A.C.* 7:7A–5.6.

---

2 Pursuant to *N.J.R.E.* 201(a), we take judicial notice of the Planning Board's Resolution of November 1, 2005, that followed from those proceedings.

In accordance with *N.J.S.A.* 13:9B–9(a)(2), Maramark gave notice to landowners within 200 feet of its proposed development that it was seeking a GP–6 permit and that objectors could submit comments directly to the DEP. That notice triggered a more than two-year-long review period. During that time, neighboring property owners submitted numerous letters to the DEP describing the already existing problems caused by run-off from the Maramark tract onto their properties and expressing concern that filling the wetlands would worsen the flooding conditions. The neighbors also retained an engineering consultant, Thonet Associates, Inc., which filed a number of reports with the DEP. In its first report, Thonet asserted that Maramark had both understated the extent of the wetlands in its permit application and mischaracterized the wetlands as isolated. Thonet claimed that the wetlands were connected to a larger surface water tributary system.

In June and August 2001, the DEP visited the Maramark property and, based on its inspections, requested that Maramark revise its freshwater permit application to show four isolated wetlands totaling 0.52 acre. In late August, the DEP issued an LOI, which concluded that the property contained four isolated wetlands, as well as a swale and a ditch,[3] all of intermediate and ordinary resource value.[4]

In November 2001, the neighbors and POND requested an adjudicatory hearing under the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –24, to contest the findings expressed in the LOI. They specifically challenged the LOI's conclusion that the wetlands were "isolated" and claimed that the LOI understated

---

[3] Swales and ditches are linear topographic depressions and are further defined in *N.J.A.C.* 7:7A–1.4.

[4] Wetlands' "resource value" is classified as "ordinary," "intermediate," or "exceptional." *N.J.S.A.* 13:9B–7; *N.J.A.C.* 7:7A–2.4. Depending on the classification, a wetland may require a surrounding transition area. *See N.J.A.C.* 7:7A–2.5. Only wetlands of exceptional and intermediate resource value require an adjacent transition area. *N.J.S.A.* 13:9B–16(a). Generally, regulated activities are prohibited in a transition area. *See N.J.S.A.* 13:9B–17.

the extent of the wetlands affected and their resource value. Although the DEP declined to refer the matter to the OAL, it did extend the comment period, permitting the objectors to provide additional information. Thereafter, Thonet submitted to the DEP another report, contending again that the wetlands were not isolated and faulting the DEP for conducting on-site inspections during a "dry period," a time purportedly not suited for determining the full nature and extent of a wetland. Thonet predicted that filling the wetlands would exacerbate flooding on adjoining properties.

Over the next year, Maramark applied for a Statewide General Permit 10A (GP–10A), *N.J.A.C.* 7:7A–5.10A, to fill wetlands for roadway access onto its property and twice more revised its GP–6 permit application. In its final application, Maramark identified 0.58 acre of isolated wetlands to be filled and detailed a storm water management plan to avert any "increased discharge of surface run-off to adjoining property." In response, Thonet challenged Maramark's storm water run-off calculations and the efficacy of its proposed detention basin. Thonet, moreover, submitted that the DEP lacked jurisdiction over the adequacy of the storm water management system, which was properly a matter for the Planning Board. During this period, the DEP received various submissions, including letters from neighboring property owners and environmental advocacy groups objecting to the proposed development; photographs and video-recordings that documented existing flooding conditions on abutting properties; a petition signed by POND members; and a letter from a local State Assemblyman requesting that the DEP conduct further review of the permit application.

In June 2002, Christopher Jones, the DEP's Raritan Region Section Chief for the Bureau of Inland Regulation, and Robert Piel, the Bureau Manager, inspected the Maramark property and took soil samples. In a July report, Jones confirmed the DEP's position that the wetlands were isolated and rejected claims that the agency's methodology for identifying and classifying wetlands

was flawed. He further noted that as a result "of the strong concern expressed by adjacent property owners, the [DEP had] scrutinized this site far more than is customary for the review of a Letter of Interpretation."

In November 2002, DEP officials, including Jones and Piel, met with neighboring property owners, their attorneys, and their engineering expert to discuss the LOI. As a result of the meeting, the DEP again extended the public comment period. Before the close of that period on February 28, 2003, the objectors submitted additional information challenging the conclusions reached in the LOI, and Jones conducted the fourth and last DEP inspection of the Maramark site.

B.

On May 6, 2003, the DEP issued Maramark a GP–6 permit to fill 0.58 acre and a GP–10A permit to fill 0.08 acre of wetlands. In a letter dated June 4, 2003, POND and affected property owners requested that the DEP grant an adjudicatory hearing allowing objectors to challenge the issuance of the GP–6 permit. The DEP Commissioner denied that request, holding that there was no statutory or constitutional property right to such a hearing. The objectors appealed separately the grant of the GP–6 permit and the denial of the adjudicatory hearing.

With regard to the issuance of the GP–6 permit, the Appellate Division found that the record "contain[ed] an abundance of factual material which could easily support" a determination that the Maramark wetlands were connected to a surface water tributary system and, therefore, were not isolated. *In re Authorization for Freshwater Wetlands Gen. Permits, Water Quality Certification & Waiver of Transition Area for Access,* 372 *N.J.Super.* 578, 596–97, 860 *A.*2d 450 (App.Div.2004). The panel expressed its "nagging concern ... that DEP's on-site inspections were conducted only during a dry period" and not during a wet season when " 'flow' conditions" would have been observable. *Id.* at 597, 860 *A.*2d 450. The panel also questioned whether the DEP had

properly analyzed the materials submitted by the objectors or properly articulated its findings of facts when issuing the GP–6 permit. *Id.* at 593, 860 *A.*2d 450. On that basis, the panel remanded to the DEP for further factfinding to determine whether the wetlands were in fact isolated. *Id.* at 598, 860 *A.*2d 450. The DEP did not petition for certification.

## C.

In a separate, unpublished opinion, the Appellate Division affirmed the DEP's decision to deny the objectors a trial-type hearing before an administrative law judge. The panel found that the objectors were afforded not only "a full opportunity to be heard by DEP during the extensive permitting process," but also judicial review of the agency's decision to grant the GP–6 permit. The panel noted that the objectors did not contend that they had not received a "public hearing."

The panel stated that the neighboring landowners must demonstrate either a statutory or constitutional right to an adversarial, adjudicatory hearing, citing *N.J.S.A.* 52:14B–3.1, –3.3. The panel determined that the neighbors, as third-party objectors, had no statutory right to a hearing before the OAL, unlike freshwater permit applicants who are entitled to such a hearing pursuant to *N.J.S.A.* 13:9B–20. It also concluded that the objectors had no constitutionally protected right to an adjudicatory hearing. The panel reasoned that the objectors' claim of a "particularized constitutional interest" in potential "worse" flooding to their properties was based on pure speculation and added that the local planning board presumably would scrutinize Maramark's drainage system to assure that such flooding did not occur. Fear of injury to a property interest, the panel submitted, is not a sufficient constitutional basis for an adjudicatory hearing. On that point, the Appellate Division stated that there was "no evidence ... that [Maramark's] proposed drainage system might not be adequate to handle any flooding that occurs so that it does not spill over onto neighboring properties."

The panel observed that "a third-party property owner's due process right to be heard by a state agency can be met by opportunities that are less than [those accorded by] trial-type hearings," citing *High Horizons Development Co. v. Department of Transportation*, 120 *N.J.* 40, 52, 575 *A.*2d 1360 (1990). Despite its remand for further factfinding, the panel was "confident" that the objectors were accorded constitutional process commensurate with their property interests.

We granted certification. 183 *N.J.* 256, 872 *A.*2d 798 (2005). We also granted the motion of the New Jersey Builders Association to participate as amicus curiae.

## II.

We must decide whether the neighboring property owners challenging the DEP's issuance of the GP–6 permit were entitled to a trial-type hearing before the OAL. The objectors "acknowledge" that they have no statutory right to such a hearing pursuant to the Freshwater Wetlands Protection Act, *N.J.S.A.* 13:9B–1 to –30. They submit, however, that the Fourteenth Amendment to the United States Constitution, and Article 1, Paragraph 1 of our State Constitution, as well as this Court's decision in *Cunningham v. Department of Civil Service*, 69 *N.J.* 13, 350 *A.*2d 58 (1975), provide them with the due process "right to an adjudicatory hearing with trial type procedures" before the DEP can issue a wetlands permit to Maramark. They argue that questions of fact concerning the extent and resource quality of the wetlands should have been presented through testimony and tested in the crucible of cross-examination before a neutral factfinder.

The DEP responds that the objectors received all the process they were due under the federal and state constitutions, and this State's jurisprudence. The DEP points out that over a two-year period it conducted an extensive investigation that included inspecting the site a number of times and reviewing the objectors' letters and expert reports. In addition, DEP officials met directly with the objectors and heard from their expert and lawyers. The

DEP concluded that the objectors' concerns regarding flooding of their properties were speculative and, therefore, the objectors did not possess property interests sufficient to trigger a constitutional right to an adversarial hearing before an administrative law judge.

A.

Under the Administrative Procedure Act, "all interested persons are afforded reasonable opportunity to submit data, views or arguments, orally or in writing, during any proceedings involving a permit decision." *N.J.S.A.* 52:14B–3.1(a). In this case, the neighboring homeowners clearly were "interested persons" and had a right to protest the issuance of a permit to fill wetlands on the Maramark property. As landowners within 200 feet of the affected property, the neighbors received notice and, over a two-year period, submitted to the DEP their data, views, and arguments, both orally and in writing, objecting to the grant of a GP–6 permit. Under the FWPA regulations, they also received a "public hearing," which is "an administrative non-adversarial type hearing before a representative or representatives of the [DEP] providing the opportunity for public comment, but does not include cross-examination." *N.J.A.C.* 7:7A–1.4. The objectors claim, however, that their interest in ensuring that a permit decision does not result in increased flooding of their properties constitutes a "particularized property interest" and requires the greater constitutional safeguards of a trial-type hearing.

Although far from a model of clarity, the Administrative Procedure Act allows that "[a] person who has a particularized property interest sufficient to require a hearing on constitutional or statutory grounds" has a right to contest a permit decision before an administrative law judge. *See N.J.S.A.* 52:14B–2(b), –3.1, –3.2, –9. The FWPA confers the right to an adjudicatory hearing before an administrative law judge to a property owner who is denied a freshwater wetlands permit. *N.J.S.A.* 13:9B–20. It does not bestow a similar right to an abutting landowner who wants to prevent the issuance of such a permit. Without a statutory right

to a trial-type hearing, the objectors must show that they have a "particularized property interest sufficient to require a hearing on constitutional ... grounds." *See N.J.S.A.* 52:14B–3.1, –3.2.

First, we must identify the nature of the property interest at stake. The objecting landowners do not have an abstract *constitutional* right to a trial-type hearing to challenge development of the Maramark property if that development will have no adverse impact on their property. In fact, the objectors do not claim that they have a constitutional right to an OAL hearing solely because of the destruction of wetlands on Maramark's property. Rather, their claim to that right is premised on the argument that the issuance of a GP–6 permit will adversely affect the use and enjoyment of *their* property by exacerbating the already existing flooding conditions that emanate from the Maramark property.

### B.

Apparently mindful of the Planning Board's jurisdiction, the objectors' expert, Thonet Associates, stated in a report that the DEP was not the proper agency for determining the adequacy of the storm water drainage system. That reasoning led the Appellate Division to conclude that at the DEP permitting stage the objectors' fear of flooding was speculative and premature. A storm water drainage system capable of capturing excess run-off from Maramark's property presumably would give the neighboring landowners no constitutional basis to complain that their properties were adversely affected.

Before issuing a freshwater wetlands permit, the DEP must consider any comments from the planning board of the municipality "wherein the regulated activity is to take place." *See N.J.S.A.* 13:9B–9(b). However, we are unaware of any provision in the FWPA, *N.J.S.A.* 13:9B–1 to –30, or the DEP's regulations promulgated to enforce the FWPA, *N.J.A.C.* 7:7A–1.1 to –17.1, that make the DEP the responsible agency for ascertaining the adequacy of a proposed storm water management system when issuing a GP–6 permit to a developer building a residential subdivision.

Clearly, in deciding whether to grant subdivision approval, the municipal planning board has jurisdiction over Maramark's storm water drainage plan. *See N.J.S.A.* 40:55D–93. The planning board is empowered to enforce detailed statewide rules that govern storm water management systems in residential subdivisions. *N.J.A.C.* 5:21–1.5(a); *N.J.A.C.* 5:21–7.1 to –7.9. Those rules, known as the New Jersey Residential Site Improvement Standards, *N.J.A.C.* 5:21–1.1 to –7.9, apply to "any site improvements ... to be carried out in connection with any application for a residential subdivision." *N.J.A.C.* 5:21–1.5(a).

 The DEP and the municipal planning board have distinct and yet interrelated purposes in a larger land-use approval scheme. For instance, in determining whether a proposed subdivision is "fundamentally suitable," the planning board must consider any "[s]pecial drainage" issues that "require particular remedies to be undertaken." *Levin v. Twp. of Livingston,* 35 *N.J.* 500, 510–11, 173 *A.*2d 391 (1961). *N.J.S.A.* 40:55D–38(b)(3) requires that a planning board's approval of a subdivision include an adequate plan for drainage. "This provision gives the Board express power to compel adequate drainage on and from a subdivided parcel to alleviate existing bad conditions and to avoid new problems in drainage." *El Shaer v. Planning Bd.,* 249 *N.J.Super.* 323, 329, 592 *A.*2d 565 (App.Div.) (citing *Ardolino v. Bd. of Adjustment,* 24 *N.J.* 94, 109, 130 *A.*2d 847 (1957)), *certif. denied,* 127 *N.J.* 546, 606 *A.*2d 360 (1991). For example, in *El Shaer, supra,* the developer received approval to fill wetlands as part of a proposal to build residential homes. *Id.* at 326, 592 *A.*2d 565. The planning board, nevertheless, denied subdivision approval because of "potential drainage problems" that were not remedied by the developer's proposed water detention basin, and the trial court and Appellate Division affirmed. *Id.* at 326–29, 592 *A.*2d 565.

Unlike the hearing that the objectors received before the DEP in the freshwater permitting process, planning board hearings are trial-like and adversarial. *N.J.S.A.* 40:55D–10(d) provides that

"[t]he testimony of all witnesses relating to an application for development shall be taken under oath or affirmation by the presiding officer, and the right of cross-examination shall be permitted to all interested parties...." The same type of adversarial, adjudicatory hearing that the objectors demanded before the DEP is essentially what they received before the Livingston Township Planning Board.

In this case, the objectors participated in hearings before the Planning Board that spanned fourteen sessions from August 2002 through September 2005. They presented witnesses, including John Thonet, of Thonet Associates, who was "accepted as an expert in the field of stormwater management and environmental sciences," and they presumably cross-examined the applicant's witnesses pursuant to *N.J.S.A.* 40:55D–10(d). On November 1, 2005, the Planning Board issued a resolution denying Maramark subdivision approval because Maramark failed "to provide evidence sufficient to enable the Board to determine that the requirements of the Township's Trees Ordinance or the State's Stormwater Management Rules have been met." We do not suppose that the Board's decision, which is subject to judicial review, will be the end of this matter.

## C.

■ With this background in mind, we now turn to the objectors' claim that they were entitled to a trial-type hearing in front of an administrative law judge before the DEP issued the GP–6 permit. Both the federal and state constitutions prohibit a State from depriving a person of property without due process of law. *U.S. Const.* amend. XIV, § 1; *N.J. Const.* art. I, ¶ 1; *see also J.E. ex rel. G.E. v. Dep't of Human Servs.*, 131 *N.J.* 552, 563, 622 *A.*2d 227 (1993) (discussing state and federal constitutional protections of property interests); *Jones v. Haridor Realty Corp.*, 37 *N.J.* 384, 391, 181 *A.*2d 481 (1962) (same). The process due in any particular case depends on the property interest at stake and the nature of the deprivation threatened by the State's action. Because due

process is a flexible and fact-sensitive concept, its demands will be a function of what reason and justice require under the circumstances. *Mathews v. Eldridge,* 424 *U.S.* 319, 334, 96 *S.Ct.* 893, 902, 47 *L.Ed.*2d 18, 33 (1976); *Doe v. Poritz,* 142 *N.J.* 1, 106, 662 *A.*2d 367 (1995); *Callen v. Sherman's, Inc.,* 92 *N.J.* 114, 134, 455 *A.*2d 1102 (1983).

In determining whether administrative procedures are "constitutionally sufficient," New Jersey courts have used different formulas, sometimes looking to the analysis set forth by the United States Supreme Court in *Mathews v. Eldridge, supra,* 424 *U.S.* at 335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33. *See, e.g., J.E., supra,* 131 *N.J.* at 566, 622 *A.*2d 227; *New Brunswick Sav. Bank v. Markouski,* 123 *N.J.* 402, 416, 587 *A.*2d 1265 (1991); *In re Polk,* 90 *N.J.* 550, 562 & n. 2, 449 *A.*2d 7 (1982). Other times, our courts have followed the "particularized property right" test set forth in *Cunningham, supra,* 69 *N.J.* at 23–24, 350 *A.*2d 58. *See, e.g., In re Amico/Tunnel Carwash,* 371 *N.J.Super.* 199, 204, 852 *A.*2d 277 (App.Div.2004); *Spalt v. N.J. Dep't of Envtl. Prot.,* 237 *N.J.Super.* 206, 208–11, 567 *A.*2d 264 (App.Div.1989), *certif. denied,* 122 *N.J.* 140, 584 *A.*2d 213 (1990). This Court referred to both formulas in *High Horizons, supra,* 120 *N.J.* at 45, 51–52, 575 *A.*2d 1360.

In *Mathews, supra,* the Supreme Court decided that a person did not have a due process right to an evidentiary hearing before termination of his Social Security disability benefits. 424 *U.S.* at 349, 96 *S.Ct.* at 910, 47 *L.Ed.*2d at 42. In assessing the constitutionality of an administrative procedure affecting a property interest, the Court set forth a three-factor test. *Id.* at 334–35, 96 *S.Ct.* at 902–03, 47 *L.Ed.*2d at 33. The first *Mathews* factor is "the private interest that will be affected by the official action;" the second is "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and the last is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33.

In applying the *Mathews* factors to administrative decision-making, courts in some jurisdictions have declined to afford the right to a trial-type hearing even to a landowner seeking a permit to develop his own property. *See, e.g., Buttrey v. United States,* 690 *F.*2d 1170, 1172, 1176–77 (5th Cir.1982) (holding that due process did not entitle dredge-and-fill permit applicant to trial-type hearing), *cert. denied,* 461 *U.S.* 927, 103 *S.Ct.* 2087, 77 *L.Ed.*2d 298 (1983); *Shoreline Assocs. v. Marsh,* 555 *F.Supp.* 169, 174–76 (D.Md.1983) (upholding denial of federal tidal wetlands permit and adjudicatory hearing to property owner who received "a meaningful opportunity" to comment, submit expert reports, and meet with administering agency (internal quotation marks omitted)), *aff'd,* 725 *F.*2d 677 (4th Cir.1984); *Fichter v. Bd. of Envtl. Prot.,* 604 *A.*2d 433, 434, 437–38 (Me.1992) (affirming denial of permit to build on sand dune to landowner and finding administrative process constitutionally sufficient despite absence of "full court-type hearing").

Likewise, courts in other jurisdictions have denied trial-type hearings to aggrieved landowners who have complained about the issuance of a permit allowing a neighbor to develop his property. *See, e.g., Sandy Beach Def. Fund v. City Council of Honolulu,* 70 *Haw.* 361, 773 *P.*2d 250, 254, 262 (1989) (upholding special use permit to developer, and finding that objectors, concerned about potential flooding and sewage treatment, were afforded due process by numerous opportunities to be heard, both in writing and orally, before council, zoning committee, and state's land use agency); *In re Shreveport Sanitary & Indus. Landfill,* 521 *So.*2d 710, 711–14 (La.Ct.App.1988) (holding that objectors to sanitary landfill permit received due process by participating in public hearings and submitting "voluminous" materials to agency, and were not entitled to adjudicatory hearing); *Ogburn–Matthews v. Loblolly Partners,* 332 *S.C.* 551, 505 *S.E.*2d 598, 600, 605–07 (Ct.App.1998) (applying *Mathews'* three-factor test and holding that due process did not require an adversarial review process for property owner challenging permit authorizing fill of 0.38 acre of

wetland on adjoining property), *overruled in part on other grounds by Brown v. S.C. Dep't of Health & Envtl. Control,* 348 *S.C.* 507, 560 *S.E.*2d 410 (2002).

In a case decided a year before *Mathews,* this Court articulated a test that addressed the need for administrative fairness when state agencies make decisions that adversely affect the property interests of state employees. In *Cunningham, supra,* the Court recognized that a person facing the deprivation of a property interest may be "entitled to a hearing as a matter of fundamental fairness and administrative due process," apart from the due process guarantees of the federal and state constitutions. 69 *N.J.* at 26, 350 *A.*2d 58. The plaintiffs in that case were demoted after their positions in the Department of Transportation were eliminated in a reorganization. *Id.* at 16, 350 *A.*2d 58. Based on a statutory reemployment list for civil servants, they claimed that they were entitled to be placed in a newly created position comparable to their prior positions. *Id.* at 16–17, 350 *A.*2d 58. The Civil Service Commission denied the plaintiffs a hearing, peremptorily determining that the old and new posts were not comparable. *Id.* at 17, 350 *A.*2d 58. We found fault in the Commission's terse handling of the matter, "embodied in [a] letter ... which simply stated that the positions were 'not comparable and, therefore, the [reemployment] list [could not] be exercised as appropriate.' " *Id.* at 26, 350 *A.*2d 58. We determined that the process afforded was deficient and noted that when "there are disputed facts underlying the question of comparability, and the applicant has a necessary proprietary or special interest, the Commission is under an obligation to afford the affected party a hearing." *Id.* at 18–19, 26, 350 *A.*2d 58. In *Cunningham, supra,* it was the particularized property right of the civil service employees, whose jobs were eliminated and who sought reinstatement to a comparable position based on a statutory seniority list, that entitled them to a hearing. *Id.* at 16, 350 *A.*2d 58.[5]

---

[5] In *High Horizons, supra,* this Court made reference to the *Mathews* and *Cunningham* factors in a decision affirming the Department of Transportation's

Following *Cunningham, supra,* the Appellate Division has held that landowners objecting to the development of neighboring property do not have a particularized property interest warranting an adversarial hearing before an administrative law judge. In *Spalt, supra,* the DEP refused to grant a hearing to shell fishermen who had a one-year leasehold in shellfish beds or to neighboring property owners challenging the DEP's issuance of a Coastal Area Facility Review Act (CAFRA) permit to a corporate entity redeveloping a Barnegat Bay marina. 237 *N.J.Super.* at 208–211, 567 *A.*2d 264. Writing for the appellate panel, Judge (later Justice) Coleman held that "simply because some of the plaintiffs reside close to the proposed [marina] site and are fearful of resultant injury to their property, does not mean they are entitled to an adjudicatory hearing." *Id.* at 212, 567 *A.*2d 264. Further elaborating on that theme, Judge Coleman noted that "[f]ear of damage to one's recreational interest or generalized property rights shared with other property owners is insufficient to demonstrate a particularized property right or other special interest." *Ibid.* Because the shell fishermen could not show that any damage would result to them before the expiration of their shellfish bed leases, the court concluded that they did not possess a sufficient property interest to warrant an OAL hearing. *Id.* at 212–13, 567 *A.*2d 264.

More recently, the Appellate Division held that adjacent landowners objecting to the construction of a car wash lacked a "particularized property interest" that triggered the right to a hearing before an administrative law judge. *In re Amico/Tunnel Carwash, supra,* 371 *N.J.Super.* at 204, 852 *A.*2d 277. In that case, a Secaucus service station owner applied to the New Jersey

---

(DOT) denial of an adversarial hearing before the OAL to an applicant seeking a state-highway-access permit. 120 *N.J.* at 45, 51–52, 575 *A.*2d 1360. However, the Court determined that proceedings before the DOT had to accord with administrative due process and that, at a minimum, the property owner had a right to "contest all evidence relied on by the agency." *Id.* at 54, 575 *A.*2d 1360. In addition, we suggested that the DOT "may allow cross-examination of its experts to satisfy [the administrative due process] requirement." *Ibid.*

Meadowlands Commission (NJMC) for three bulk variances need-
ed to construct a car wash on his property. *Ibid.* A husband and
wife, who were adjacent landowners, participated at a hearing on
the variances conducted by NJMC's Chief Engineer. *Id.* at 205,
852 *A.*2d 277. The husband testified at the hearing and the
couple's attorney cross-examined the applicant's witnesses. *Ibid.*
Expert reports submitted by the couple concluded that construc-
tion of the car wash would "create unsafe traffic conditions and
have an adverse impact on the surrounding neighborhood." *Ibid.*
The NJMC approved the variance application and the adjoining
property owners appealed. *Id.* at 205–06, 852 *A.*2d 277. In an
opinion by Judge Skillman, the appellate panel held that the
adjacent landowners did not have "a particularized property inter-
est in [the service station owner's] development plan that entitle[d]
them to [an OAL] hearing." *Id.* at 212, 852 *A.*2d 277. The panel
found that any increased traffic congestion in front of their
property was "similar to the impacts commonly experienced by
owners of property in the vicinity of any proposed new develop-
ment" and was insufficient to justify a hearing before an adminis-
trative law judge. *Ibid.*

### III.

██ In the land-use permitting context, the cases discussed
above suggest that a third-party objector's due process rights may
be satisfied by an agency's review process, even absent trial-type
procedures. In this case, the objectors received a trial-type
hearing before the Planning Board on Maramark's proposed
drainage system. In the totality of the circumstances before us,
we agree with the Appellate Division that the DEP's administra-
tive procedures, which were subject to judicial review, satisfied the
constitutional demands of due process. We have detailed the
investigation conducted by the DEP before issuing the GP–6
permit. During a comment period lasting more than two years,
the DEP reviewed the objectors' letters, submissions, and expert

reports; made site visits; and met with the affected property owners, their expert, and their attorneys.

Significantly, the administrative process provided in this matter cannot be viewed in isolation. In determining whether the objectors received due process, it is appropriate to consider the interplay between the DEP and Planning Board hearings. The issuance of a GP-6 permit to Maramark was but one step in a larger permitting process before Maramark could begin to build homes. The DEP's Letter of Interpretation identified the nature, quality, and extent of the wetlands. It did not address the water run-off consequences to Maramark's neighbors of filling wetlands. The objections to the LOI focused on whether the wetlands were isolated or part of a larger tributary system, not on drainage.

The GP-6 permit, which is a prerequisite to Maramark obtaining subdivision approval, is not a license to Maramark to flood its neighbors' properties. In fact, Maramark would be subject to civil liability if by developing its property it caused damaging flooding to its neighbors' properties. *See Armstrong v. Francis Corp.*, 20 *N.J.* 320, 326–30, 120 *A.*2d 4 (1956). Maramark could not move a spade of earth before it met all the concerns of the Planning Board, one of which was how Maramark intended to control the drainage on its property. Before the Livingston Township Planning Board, the objectors received an adversarial, trial-type hearing on the subject of the adequacy of Maramark's storm water drainage plan. Maramark was unable to persuade the Planning Board that its proposed drainage system met "the State's Stormwater Management Rules." Viewed in that context, the threat of flooding following the issuance of the GP-6 permit was purely conjectural.[6]

---

[6] Our decision is based on the facts before us, and on the totality of process afforded the objectors. We do not suggest that, standing alone, the DEP's administrative procedures for issuing a freshwater wetlands permit may not be sufficient to satisfy due process in any particular case.

Therefore, in looking at the first *Mathews* factor, "the private interest that will be affected by the official action," 424 *U.S.* at 335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33, we recognize that the issuance of the freshwater wetlands permit was a preliminary stage of the approval process for the Maramark development. The objectors' constitutional property interest had not ripened at that point. Even if the issuance of a GP–6 permit, by itself, would mean a greater run-off of water from the Maramark property, the adequacy of the drainage system controlled whether there would be any additional flooding onto the neighbors' properties. In this case, that was primarily a matter for the Planning Board.

We also conclude that, under the second *Mathews* factor, no additional procedural safeguards in the DEP's decision-making process were constitutionally required, particularly when measured against the third *Mathews* factor, which includes "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Ibid.* Concerning the issuance of the GP–6 permit, the benefits of any additional safeguards from an adversarial hearing were outweighed by the administrative burdens, not to say by the economic hardships that would have been borne by the permit applicant. Excessive administrative barriers in the permitting process can stifle legitimate growth and development. Here, the DEP provided administrative due process under the federal and state constitutions through a painstaking two-year review process, which entailed consideration of the neighbors' firsthand accounts of flooding conditions; review of the objectors' expert reports; on-site visits; and meeting with the objectors, their expert, and their attorneys.

Last, because the threat to the objectors' properties by the issuance of a GP–6 permit is speculative, the objectors did not possess the type of "particularized property interest" that entitled them to a trial-type hearing under *Cunningham, supra.* *See Spalt, supra,* 237 *N.J.Super.* at 212, 567 *A.*2d 264 (holding that speculative nature of affected property interest did not create "particularized property interest"). The inchoate property inter-

ests of the objectors before the DEP in this matter cannot be likened to those of the civil service employees in *Cunningham, supra,* who lost their positions in a reorganization and then were unceremoniously denied the right to a hearing of any kind when they applied for a purportedly comparable position to the ones they had lost.

## IV.

In conclusion, we affirm the Appellate Division's decision upholding the DEP's denial to petitioners of a trial-type hearing before the OAL.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO—7.

*Opposed*—None.