**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4700-18

IN THE MATTER OF
STEVEN ISRAEL (LINCOLN
HARBOR YACHT CLUB)
WATERFRONT DEVELOPMENT
INDIVIDUAL PERMIT AND
WATER QUALITY CERTIFICATE
NO. 0911-14-0001.1 WFD180002
CHALLENGED BY HARTZ
MOUNTAIN INDUSTRIES, INC.
AND 1500 HARBOR BOULEVARD
PARTNERS, LLC.

_____

Submitted June 8, 2022 – Decided July 5, 2022

Before Judges Whipple, Geiger and Susswein.

On appeal from the New Jersey Department of Environmental Protection.

Chiesa, Shahinian & Giantomasi, PC, attorneys for appellants Hartz Mountain Industries, Inc. and 1500 Harbor Boulevard Partners, LLC (Dennis M. Toft and Michael K. Plumb, on the briefs).

Matthew J. Platkin, Acting Attorney General, attorney for respondent New Jersey Department of Environmental Protection (Sookie Bae, Assistant

Attorney General, of counsel; Jason B. Kane, Deputy Attorney General, on the brief).

Steven Israel, respondent pro se.

PER CURIAM

Steven Israel is the president of Lincoln Harbor Yacht Club (LHYC), a condominium association that owns and operates a marina on the Hudson River in Weehawken, New Jersey. LHYC's condominium interests are owned by Lincoln Harbor Enterprises, LLC, of which Israel is the sole managing member.

Hartz Mountain Industries, Inc., (Hartz), previously owned the marina. In 1986, Hartz and the Township of Weehawken executed a Reciprocal Construction Operation and Easement Agreement (RCOEA) that reserved certain of Hartz's rights in the marina. Those rights run with the land and bind subsequent owners. In 1989, after developing the marina, Hartz conveyed it to Sloan Marine Associates, L.P., (Sloan). Sloan subsequently conveyed the property, which LHYC now owns.

The marina has six docks, Docks A through F, extending eastward into the Hudson River. Along the federal navigation channel, a fixed, wooden

wave screen[1] extended the length of Dock F between the dock and the river. The wave screen extended southward approximately twice the length of Dock F, and then westward back toward the marina at a near ninety-degree angle. Over the past two decades, a dramatic increase in ferry wakes and storms caused the wave screen to deteriorate.

In 2015, to prevent complete collapse of the wave screen, LHYC moored a barge up against it, inside the Federal Navigation Channel. The barge was moored parallel to Dock F and a portion of the wave screen that ran alongside. The barge also allowed LHYC to maintain its thirty-year relationship with Spirit Cruises, which provides required public access and operates scheduled cruises.

In June 2016, Israel applied to the New Jersey Department of Environmental Protection (NJDEP) for a Waterfront Development (WFD) permit to rehabilitate the wave screen. Licensed marine engineers compiled the accompanying supporting documentation, which included a project

---

[1] A wave screen is a fixed structure that is a type of wave attenuator; both wave screens and wave attenuators are types of breakwaters. We use the term "wave screen" to refer to the existing deteriorated breakwater, and we use the term "wave attenuator" to refer to the applied-for breakwater. Wave attenuators are "designed to protect boat moorings, including those at marinas, by intercepting wakes or waves . . . which would normally impact the adjacent boat mooring areas." N.J.A.C. 7:7-12.20(a).

narrative, an environmental review and coastal zone management assessment, site photos, current site surveys, proposed plans, an inspection report, and an alternatives analysis. In July 2016, NJDEP deemed the application administratively complete.

The application proposed demolition of Dock F and the entire wave screen, then repositioning the barge to take the place—and function—of both Dock F and the wave screen. To replace the portions of the wave screen that extended southward beyond Dock F and then westward back toward the marina, the application proposed installation of two separate floating wave attenuators. All three structures would extend below the surface and be anchored to the bottom of the river or mudline.

Hartz and 1500 Harbor Boulevard Partners, LLC (1500 Harbor), own adjacent properties and received notice of the permit application. In September 2018, they submitted a joint objection to the NJDEP application, arguing that they had been, and would continue to be, adversely impacted by the improper and illegal operations at LHYC. They argued the application was substantively deficient and should be denied. In support, they submitted expert memoranda from a former NJDEP Commissioner who opined on the

noncompliant conditions at LHYC and deficiencies with the permit application.

The NJDEP reviewed the application as well as the objections. In mid-September 2018, NJDEP requested additional information from Israel, which he provided and later requested and received additional information from Israel about issues raised by the objections. NJDEP also completed a Threatened and Endangered Species Review in September. NJDEP completed the WFD Environmental Report, which concluded the proposal conformed with several Coastal Zone Management (CZM) rules. NJDEP issued the permit on October 11, 2018, and published the permit in the November 7, 2018 NJDEP Bulletin.

On November 26, 2018, Hartz and 1500 Harbor requested an adjudicatory hearing, which Israel opposed. The request took issue with several findings adduced through NJDEP's permit review. Hartz and 1500 Harbor also included expert reports from two separate engineering firms that analyzed the approved plans and argued that each was entitled to an adjudicatory hearing given the "particularized property interests that [were] significantly and detrimentally affected" by NJDEP's approval of the permit.

In May 2019, the NJDEP Commissioner issued a seven-page order denying Hartz's and 1500 Harbor's requests because neither demonstrated a statutory or constitutional right to an adjudicatory hearing. This appeal by Hartz and 1500 Harbor contests both the permit approval and the Commissioner's order that followed.

## I.

In an appeal of a final agency decision, we "intervene only in those rare circumstances in which an agency action is arbitrary, capricious, or unreasonable . . . or [is] otherwise not supported by substantial credible evidence in the record . . . ." Twp. Pharmacy v. Div. of Med. Assistance & Health Servs., 432 N.J. Super. 273, 283 (App. Div. 2013) (citations omitted). Three inquiries inform this deferential standard: "(l) whether the agency's decision conforms with relevant law; (2) whether the decision is supported by substantial credible evidence in the record; and (3) whether, in applying the law to the facts, the administrative agency clearly erred in reaching its conclusion." Id. at 283-84.

Should the final decision satisfy these criteria, we must "give substantial deference to the agency's fact-finding and legal conclusions," in part because of the "agency's 'expertise and superior knowledge of a particular field.'" Id. at

6

284; (quoting Circus Liquors, Inc. v. Middletown Twp., 199 N.J. 1, 10 (2009)). However, our review should not be "a pro forma . . . rubber stamp[]" of the agency's decision when that action was "not reasonably supported by the evidence." Outland v. Bd. of Trs. Pension & Annuity Fund, 326 N.J. Super. 395, 400 (App. Div. 1999).

In New Jersey, "third parties generally are not able to meet the stringent requirements for constitutional standing in respect of an adjudicatory hearing." In re NJPDES Permit No. NJ0025241, 185 N.J. 474, 482 (2006). A third-party objector may only trigger an adjudicatory hearing when it "can show a statutory right or a constitutionally protected property interest." In re Waterfront Dev. Permit No. WD88-0443-1, 244 N.J. Super. 426, 436 (App. Div. 1990). Enforceable deed restrictions in a permittee's property may constitute a particularized interest sufficient to warrant an adjudicatory hearing. See In re Riverview Dev., LLC, 411 N.J. Super. 409, 434-35 (App. Div. 2010).

## II.

Hartz argues that valid restrictive covenants in the RCOEA establish the requisite interests that entitle it to an adjudicatory hearing. Based on our

7

examination of the RCOEA and the deed transfers, we agree with the Commissioner's conclusion that they do not create such an interest.

Notably, the RCOEA differentiates between restoration work and other alterations. Article XII of the RCOEA obligates the owner to repair or rebuild any damage to improvements. Article XIII mandates that any "alteration, addition, [or] improvement[]" conform to certain provisions of Article X. Those Article X provisions require the owner to submit any plans for "alterations, additions or other improvements" to Hartz. Any alterations must also conform to the "design criteria" for "utilities," "walkways," "lighting," as well as "architectural continuity." "The plans for all buildings, structures . . . or other improvements being or to be constructed on the Property shall, to extent reasonably possible, be harmonious as to quality and type of exterior materials to be used with other improvements." Section seven of Article X holds the owner "responsible for obtaining all licenses, permits and approvals required" to make such improvements.

When Hartz conveyed the marina to Sloan, the deed reserved Hartz's rights to architectural continuity. The deed included a series of additional provisions that provided, in relevant part, "[n]o alterations may be made to the

Dock System" which includes but is not limited to "decking," "pilings," "pile guides," and "hardware."

While the RCOEA limits some alterations, those limitations do not apply to activities by an owner to repair, rebuild, or restore improvements on a lot that has been damaged or destroyed. We agree with the Commissioner that:

> [T]he activities authorized under the Permit allow [LHYC] to repair the damaged docks and wave [screen] by removing two docks and replacing the wave [screen] with a new wave attenuator. The architectural continuity obligations relied on by Hartz do not establish a property right particular to the activities authorized by the Permit. To the extent Hartz seeks to enforce its contractual rights to control the aesthetic aspects of the marina, an adjudicatory hearing would not be the proper forum.

The provisions contained in the deed prohibiting alterations to the dock system do not support Hartz. Those provisions were excised by LHYC in a subsequent, duly recorded deed amendment.

The deed reserved Hartz's "Air Rights Parcel" over the marina. These retained air rights did not, however, give Hartz the right to interfere with or veto use of the marina; moreover, the record established the restrictions were abrogated and completely excised by a subsequently recorded deed amendment. Accordingly, we agree Hartz lacks a particularized property interest and is not entitled to an adjudicatory hearing.

A-4700-18

We discern nothing arbitrary, capricious, or unreasonable about the NJDEP's determinations concerning Hartz's rights under the RCOEA and deed.

III.

1500 Harbor argues the permitted activity will result in trespass and damage to its property. It cites its experts' reports to assert this damage is impending, rather than merely speculative. These harms, they argue, are sufficient to confer the particularized property interest needed to obtain an adjudicatory hearing. We disagree.

Speculative damages to neighboring property do not amount to a particularized interest. See In re Freshwater Wetlands Statewide Gen. Permits, 185 N.J. 452, 473 (2006). Proximity to the permitted site and a general fear of future damage to one's own property is similarly insufficient to trigger an adjudicatory hearing. Spalt v. N.J. Dep't of Env't Prot., 237 N.J. Super. 206, 212 (App. Div. 1989). "[I]mpacts commonly experienced by owners of property in the vicinity of any proposed new development[]" do not constitute particularized property interests. In re AMICO/Tunnel Carwash, 371 N.J. Super. 199, 212 (App. Div. 2004).

1500 Harbor also argues the permit affects its interests in its own property. First, it claims that floating docks at the marina have already caused

10

damage and the proposed anchoring system approved by the permit, "may slide through the mud," presenting "potential hazards for . . . 1500 Harbor." Despite the ambiguous language its expert uses, 1500 Harbor argues its fear of damage is not speculative. They claim the anchors will eventually slip in the mud, moving the wave attenuation system, which could also "break[] free in an inevitable storm event."

The Commissioner determined 1500 Harbor's arguments were too speculative and attenuated to entitle it to an adjudicatory hearing. Clearly, the harms claimed by 1500 Harbor involve speculation about future events. Though characterizing its expert reports as predicting impending damage, the reports themselves bely any such notion. Because 1500 Harbor's arguments here suffer from the same lack of specificity, they are insufficient to entitle 1500 Harbor to an adjudicatory hearing.

## IV.

Hartz and 1500 Harbor both argue due process entitles them to a hearing under the three-part test in <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976). We are not persuaded because the parties received all the process they were due.

"[A] third-party objector's due process rights may be satisfied by an agency's review process, even absent trial-type procedures." <u>In re Freshwater</u>

11

Wetlands, 185 N.J. at 471. "[W]hether a third-party objector's due process rights may be satisfied by an agency's review process depends in significant part on the objector's ability to participate in the process." In re Thomas Orban/Square Props., LLC, 461 N.J. Super. 57, 79 (App. Div. 2019).

Our courts employ the three-part test in Mathews to determine "whether administrative procedures are 'constitutionally sufficient.'" In re Freshwater Wetlands, 185 N.J. at 467. Under Mathews, we consider (i) "the private interest that will be affected by the official action;" (ii) "the risk of an erroneous deprivation of such interest through the procedures used;" and (iii) the State's "interest, including the function involved and the fiscal and administrative burdens" that a hearing would entail. 424 U.S. at 334-35.

The first Mathews factor requires the permit to affect appellants' private interests, but Hartz and 1500 Harbor cite the same interests we previously rejected. The lack of any particularized property interest also dooms any chance of prevailing under Mathews.

Even if we recognized a sufficient property interest, which we do not, appellants received all process due under the second Mathews factor through NJDEP's permit application procedures. Both participated actively in the application process and raised a multitude of concerns and their objections

resulted in NJDEP requesting additional information from Israel. NJDEP procedures provided, and appellants availed themselves of, the opportunity to be heard.

The third <u>Mathews</u> factor also weighs against conducting an adjudicatory hearing. The Office of Administrative Law routinely adjudicates contested permits from applicants where a third-party objector has clearly established rights in the property subject to the DEP's permitting decision, but appellants lack any appreciable rights in the marina, which fails to outweigh the burden imposed in conducting a hearing. Accordingly, denial of an adjudicatory hearing did not deny appellants of their due process rights.

Both appellants also argue NJDEP improperly reviewed the application of its CZM rules and in so doing, arbitrarily, capriciously, and unreasonably issued the permit. They argue NJDEP misapplied the CZM rule regarding vertical wave attenuators, and failed to apply rules concerning public access, submerged aquatic vegetation, and solid and hazardous waste and that since the now-permitted barge will continue to function as a pier, NJDEP should have analyzed a series of separate CZM rules pertaining to docks and piers. We reject this argument.

13

The CZM rules allow for certain permit-by-rule activities where certain activities may "be conducted without prior [DEP] approval . . . ." N.J.A.C. 7:7-3.3(a). One such permit-by-rule "authorizes the reconfiguration of any legally existing dock, wharf, or pier . . . located at a legally existing marina . . . ." N.J.A.C. 7:7-4.14.

Here, even though the attenuator is a change in structure from fixed to floating, it still falls under the permit-by-rule regulations. The marina's original wave screen and fixed pier was already previously permitted with the initial marina construction in 1989. Here, the new structure remains in the same footprint, with the same function. The proposal does not involve construction of new recreational docks and piers; therefore, N.J.A.C. 7:7-12.5 is inapplicable.

The permit authorizes the repositioning of the barge to replace a previously permitted dock within the same footprint. Essentially, the barge would become the new dock. The two additional wave attenuators would extend from the barge, taking up the portion of the wave screen that extended beyond the original Dock F. Here, since swapping out the fixed pier with the barge constitutes a "reconfiguration," NJDEP properly determined this proposal to be within the permit-by-rule guidelines. As such, a review of CZM

14

rules relating to docks, piers, buffers, compatibility of uses, traffic impacts, recreational uses, and secondary impacts was not necessary. CZM rules use the word "preexisting" to indicate a structure already in physical existence. See, e.g., N.J.A.C. 7:7-1.5; N.J.A.C. 7:7-2.2(f)(2). The marina and pier had both legally existed since NJDEP approved the initial development in 1989. Nothing in the administrative record indicates that the permit does not authorize this proposed action.

N.J.A.C. 7:7-12.20 governs vertical wave attenuators like those authorized by the permit. They are "structures designed to protect boat moorings, including those at marinas, by intercepting wakes or waves and reducing the wake or wave energy which would normally impact the adjacent boat mooring areas." N.J.A.C. 7:7-12.20(a). They "may be fixed or floating, attached or detached, depending on the water depth, tidal range, and wave climate." N.J.A.C. 7:7-12.20(e).

Construction of vertical wave attenuators "is conditionally acceptable," and the "porosity" of the structure, which includes "the distance between the structure and the bottom of the water body, shall be determined on a case-by-case basis." N.J.A.C. 7:7-12.20(b). In this assessment, NJDEP should consider vessel traffic, water depth, and tidal flow. N.J.A.C. 7:7-12.20(c)(1)

explains "vertical wake or wave attenuation structure[s] may be designed [in] [h]igh wake or wave energy areas . . . such as the Hudson River between New Jersey and New York . . . ."  Further, such structures "may be designed to . . . extend to a depth of between [thirty] and [forty] feet, or to the bottom of the water body, whichever is less, to intercept almost all wave energy."  Ibid.

The water is approximately thirty-eight feet deep where the attenuators would be installed.  The attenuators "would be approximately [twenty-one] feet deep and ballasted to maintain separation from the mudline of between [twenty] and [twenty-six] feet."  On this basis, appellants argue that N.J.A.C. 7:7-12.20(c)(1) requires vertical wave attenuators either extend thirty to forty feet below the water's surface or to the mudline.  Because the permitted structures are "up to [twenty-one] feet short of being the minimum allowable depth for a wave attenuation structure," NJDEP mis-applied this CZM rule.

However, the CZM rule pertaining to wave attenuators merely "provides design guidance for these structures."  NJDEP should consider aspects like "vessel traffic" and "water depth," and "shall" make such determinations "on a case-by-case basis."  N.J.A.C. 7:7-12.20(b).  NJDEP did so here and determined that the wave attenuators sought in the application conformed to the CZM rules.

16

We also reject appellants' argument NJDEP should have evaluated the public access requirements of N.J.A.C. 7:7-16.9. Appellants reference the original WFD permit that required public access opportunities in the marina's initial development. N.J.A.C. 7:7-16.9(m)(1) relates to "existing marina development . . . ." When "the proposed activity consists of maintenance, rehabilitation, renovation, redevelopment, or expansion that remains entirely within the parcel containing the existing development," then "[a]ny existing public access shall be maintained." Ibid.

Here, the "breakwater rehabilitation and restoration" would "remain[] in the same footprint, with the same function." The application "did not propose any new or modified use to the marina operations itself or to public access." Thus, because the permit sought to rehabilitate pre-existing portions within the marina and did not propose any change to public access, NJDEP appropriately refused to apply the more stringent public access requirements of N.J.A.C. 7:7-16.9.

We similarly reject the arguments considering Submerged Aquatic Vegetation (SAV) requirements of N.J.A.C. 7:7-9.6. and solid and hazardous waste requirements of N.J.A.C. 7:7-16.14.

SAV rules generally prohibit development in certain SAV-designated areas.  See N.J.A.C. 7:7-9.6.  SAV area maps are publicly available on the internet.  No part of the Hudson River is designated as an SAV area.

Appellants also argue NJDEP failed to fully assess "solid and hazardous waste associated with the development."  Specifically, they contend survey data provided with the application shows LHYC has violated the River and Harbors Act of 1899, 33 U.S.C. § 407, and NJDEP should have rejected this application due to the "ongoing violation."

The application analyzed the applicability of N.J.A.C. 7:7-16.14.  The CZM rules assessment contained in the application detailed the equipment that would be used for removal and demolition of certain structures at the marina.  "All protocols related to spoils handling and disposal would conform with all applicable state and Federal regulations, standards[,] and guidelines for the handling and disposal of solid and hazardous wastes."

NJDEP was within its ability to conclude no further consideration was required.  The application laid out a plan for compliance with the solid and hazardous waste rule.  Moreover, to the extent appellants allege ongoing violation of a federal statute based on one aerial photo and overlaid drawing, NJDEP refused to "review the operation of the existing marina."  Further, the

18

permit remained expressly contingent on federal approval, thus appellants' arguments in this regard are either premature or misplaced. Accordingly, NJDEP properly refused to consider the provisions of N.J.A.C. 7:7-16.14.

As to any remaining arguments, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(D).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION