986 A.2d 714 (2010)
411 N.J. Super. 409
In the Matter of RIVERVIEW DEVELOPMENT, LLC, Waterfront Development Permit No. 0908-05-0004.3 WFD 060001.
A-1843-08T3
Superior Court of New Jersey, Appellate Division.
Argued December 9, 2009.
Decided January 27, 2010.
*715 Ira E. Weiner, Montvale, argued the cause for appellant Bergen Ridge Homeowners Association, Inc. (Beattie Padovano, LLC, attorneys; John J. Lamb and Mr. Weiner, on the brief).
Scott E. Rekant, Trenton, argued the cause for respondent Riverview Development, LLC (Sokol, Behot & Fiorenzo, attorneys, Hackensack; Mr. Rekant, on the brief).
Rachel J. Horowitz, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Anne Milgram, Attorney General, attorney; Lisa Daglis, Deputy Attorney General, on the statement in lieu of brief).
Before Judges STERN, SABATINO and NEWMAN.
The opinion of the court was delivered by
SABATINO, J.A.D.
We are asked in this appeal to consider whether townhouse residents, whose views of the Hudson River and the New York City skyline will be fully or partially blocked by a proposed high-rise development, have the right to a trial-type hearing in the Office of Administrative Law ("OAL") to contest the high-rise developer's application to the Department of Environmental Protection ("DEP") for a waterfront development permit under the Coastal Zone Management Regulations, N.J.A.C. 7:7E-1.1 to -8A.5. The residents also complain that the project will worsen traffic near their hillside dwellings. The DEP Commissioner denied the residents' demand for an OAL hearing, concluding that they lacked "a particularized property interest sufficient to require a hearing on constitutional or statutory grounds," as is necessary under N.J.S.A. 52:14B-3.2.
Through their homeowners' association, the residents now appeal the Commissioner's denial of an OAL hearing. We affirm.

I.
The limited record before us presents these facts and chronology of events bearing upon our analysis.
Appellant, Bergen Ridge Homeowners Association, Inc. ("Bergen Ridge"), is a not-for-profit homeowners' association representing the owners of thirty-four townhomes within Lot 6B of Block 435 of North Bergen. The townhomes are located on a gently-sloped plateau that juts out from the side of the Palisade cliff, between eighty and ninety feet above the Hudson River. Access to the Bergen Ridge complex is only available from Bulls Ferry Road, a road that runs diagonally up the side of the cliff. Bulls Ferry Road is connected to River Road, a thoroughfare which runs along the banks of the Hudson, and Kennedy Boulevard, which runs along the top of the Palisade.
The townhomes in the Bergen Ridge complex were built in or about 1997. The units are all approximately thirty feet high, with rooflines between 110 and 119 feet in elevation above the Hudson River. According to a valuation prepared at Bergen *716 Ridge's request in January 2006 by Donald J. Helmstetter, a real estate appraiser, the townhomes "are all considered to be in good condition and they all have attractive functional floor plans and layouts." Additionally, as Helmstetter noted, "[a]ll of the units have an unimpeded view to the east of the Hudson River and the Manhattan Skyline."
Respondent, Riverview Development, LLC ("Riverview"), is a corporation with its headquarters in Rockaway Beach, New York. In May 2005, Riverview acquired from North Bergen Township several vacant lots along the banks of the Hudson River: Lots 4A and 4B and a portion of Lot 1 of Block 438.
At some point prior to Riverview's purchase, a predecessor in title, Slazer Development, L.L.C. ("Slazer"), performed grading and filling work on the lots without a permit. The unauthorized grading and filling triggered a notice of violation by the DEP. Because the DEP's notice of violation was served on Slazer after Riverview had already bought the property, Riverview was made subject to the violation notice. Subsequently, Riverview negotiated an administrative consent order ("ACO") with Slazer and the DEP to remedy the violation.

Riverview's Initial and Amended Permit Application
In November 2005, Riverview filed an application with the DEP for a waterfront development permit, as required under the Waterfront Development Law of 1914, N.J.S.A. 12:5-3a, and the associated Coastal Permit Program Rules, N.J.A.C. 7:7-2.3. The DEP permit, if approved, would authorize Riverview to build a residential housing complex on the property. The project is located in what DEP regulations classify as the "Hudson River Waterfront Area." N.J.A.C. 7:7E-3.48(a)2.
As proposed by Riverview, the new complex would consist of seventeen townhomes along a 1,150 foot riverside walkway; a two-floor parking structure; and three high-rise towers. The towers would rise to a maximum height of ninety-five feet and would hold 256 condominium units.
Riverview's initial waterfront permit application only referenced Lots 4A and 4B, but not Lot 1, and provided notice of the impending project to property owners located within 200 feet of those two particular lots. As a result of complaints about alleged deficiencies in the permit application, Riverview withdrew its application in March 2006. Riverview then resubmitted an application to the DEP in May 2006, with the proper lots identified and the appropriate notices supplied.
At the request of Bergen Ridge, the DEP convened a public hearing on June 27, 2006 in North Bergen, giving the neighboring property owners a chance to present their objections and concerns. In advance of that public hearing, Riverview provided the DEP with a water quality proposal, a stormwater management report, and a traffic study.[1]

The High-Rise Structure Regulations
The key regulatory provisions, for purposes of this appeal, are the DEP's "High-rise structures" regulations, codified at N.J.A.C. 7:7E-7.14. These regulations state, in pertinent part:
(a) High-rise structures are structures which are more than six stories or more *717 than 60 feet in height as measured from existing preconstruction ground level.
(b) The standards for high-rise structures are as follows:
1. High-rise structures are encouraged to locate in an urban area of existing high density, high-rise and/or intense settlements;
2. High[-]rise structures within the view of coastal waters shall be separated from coastal waters by at least one public road or an equivalent area (at least 50 feet) physically and visually open to the public except as provided by N.J.A.C. 7:7E-3.48;
3. The longest lateral dimension of any high[-]rise structure must be oriented perpendicular to the beach or coastal waters, except for a high[-]rise structure that is located in the Redevelopment Zone of the City of Long Branch and authorized pursuant to the Long Branch Redevelopment Zone Permit at N.J.A.C. 7:77.4.
4. The proposed structure must not block the view of dunes, beaches, horizons, skylines, rivers, inlets, bays, or oceans that are currently enjoyed from existing residential structures, public roads or pathways, to the maximum extent practicable;
....
6. The proposed structure must be in character with the surrounding transitional heights and residential densities, or be in character with a municipal comprehensive development scheme requiring an increase in height and density which is consistent with all applicable Coastal Zone Management rules;
7. The proposed structure must not have an adverse impact on air quality, traffic, and existing infrastructure; and
....
[N.J.A.C. 7:7E-7.14(a)-(b) (emphasis added).]
In light of these requirements, the DEP requested from Riverview a "view shed" analysis.[2] The view shed analysis would depict anticipated views of the proposed project from various nearby locations.

Traffic Issues and the Related Regulations
Riverview's traffic study was performed by Schoor DePalma, an engineering firm. The study anticipated the addition of a fourth "leg" to the Bulls Ferry Road/River Road intersection, which would provide a driveway into the new development. Additionally, the plans called for an exclusive left-turn lane into the project from River Road southbound, so as to ease traffic concerns in that direction. Two additional driveways with exclusive access onto northbound River Road would be built, one above and one below the main intersection.
Schoor DePalma's traffic study, which had originally been submitted with Riverview's initial permit application, but had been redrawn to incorporate comments from Hudson County, specifically addressed the traffic requirements codified at N.J.A.C. 7:7E-8.14. Section 8.14 restricts coastal development that causes disturbance to traffic systems. The regulation states, in relevant part, that:
(a) Traffic is the movement of vehicles, pedestrians or ships along a route.
(b) Coastal development shall be designed, located and operated in a manner to cause the least possible disturbance to traffic systems.

*718 ....
(d) Any development that causes a location on a roadway to operate in excess of capacity Level D is discouraged. A developer shall undertake mitigation or other corrective measures as may be necessary so that the traffic levels at any affected intersection remain at capacity Level D or better. A developer may, by incorporating design modification or by contributing to the cost of traffic improvements, be able to address traffic problems resulting from the development, in which case development would be conditionally acceptable. Determinations of traffic levels which will be generated will be made by the New Jersey Department of Transportation. [N.J.A.C. 7:7E-8.14(a)-(d) (emphasis added).]
Schoor DePalma rated the site as generally having, at worst, a level of service[3] of "D", both from Bulls Ferry Road onto River Road and from southbound River Road onto Bulls Ferry Road. The traffic expert further opined that the lanes of River Road directly affected by entry and exit of vehicles from the proposed development would not suffer a level of service worse than "B", either in the morning or evening rush hours.

The DEP Staff's Preliminary Analysis
Prior to the public hearing, staff in the Bureau of Inland Regulation within the DEP's Division of Land Use Regulation prepared a written preliminary analysis of the Riverview project's compliance with applicable waterfront regulations. The preliminary analysis, dated June 27, 2006, was signed by a DEP geologist, Joslin Tamagno.
In their preliminary analysis, the DEP staff favorably noted that "[t]he subject site is located in an urban area where high-rise development is common." The analysis also noted that the "proposed high-rise structures will be 95 feet in height and the proposed locations will be 50 feet from the water's edge." Additionally, staff indicated that "[t]he three high-rise structures will be oriented perpendicular to the Hudson River." To evaluate whether the site was otherwise in compliance with the high-rise regulations, the DEP asked Riverview to supply the aforementioned view shed analysis.
With respect to traffic, the DEP staff stated in their preliminary analysis that "the adjacent street system of North Bergen and Hudson County with improvements as proposed will not experience any significant degradation in operating conditions." As a result, staff indicated that the applicable traffic standards preliminarily appeared to be met by the project.

The June 27, 2006 Public Hearing
The public hearing took place, as scheduled, on June 27, 2006. The record supplied to us has only limited information about the details of the public hearing. We do not know, for example, how many people attended the hearing, exactly who was present from the DEP, Riverview and Bergen Ridge, respectively, or how much time the hearing consumed. There is no *719 indication that any sworn testimony was adduced, or that any cross-examination was conducted. The hearing apparently was not recorded, and thus we have no transcript of what was said. Nevertheless, it is undisputed that one or more representatives of Bergen Ridge, including its environmental planning expert, John Thonet, P.E., P.P., spoke in opposition to the issuance of a permit. Thonet circulated or displayed at the meeting PowerPoint slides, highlighting critical aspects of Bergen Ridge's opposition.
Thonet's PowerPoint presentation detailed several alleged regulatory violations at the project site. The presentation included several photographs and documents showing the unpermitted clearing and grading that had already occurred on the property.
With respect to the high-rise issues, Thonet contended that the proposed Riverview complex "has its longest direction in a north-south direction, [as opposed to east-west,] thus blocking all views of the New York skyline from River Road." He asserted that "[t]his is a significant scenic impact of the project, requiring a variance [from North Bergen Township zoning requirements.]" Thonet also noted that DEP has "a similar building orientation requirement." See N.J.A.C. 7:7E-7.14(b)3.

Further Review By the DEP After the Public Hearing
After the public hearing, the parties submitted additional materials to the DEP. In letters dated June 30 and July 12, Bergen Ridge amplified its concerns about the illegal filling on the site that had been performed. Following up on those concerns, Randy Bearce of the DEP's Coastal Land Use Compliance and Enforcement Division conducted a site inspection of the project on July 18, 2006.
In a letter the following day, Riverview stated its understanding of the results of Bearce's inspection.[4] According to this letter, the inspection revealed that the entirety of the property consisted of "historic fill," and that there had been no improper filling or grading below or near the "Spring High Tide Line." However, Riverview's interpretation was questioned by Thonet in a letter to the DEP dated July 27, 2006.

The Experts' View Shed Analyses
On July 14, 2006, Riverview submitted to the DEP the requested view shed analysis. The analysis contained six photographs of the project site taken from various angles.
Bergen Ridge's counsel responded with a letter to the DEP commenting upon Riverview's view shed analysis. The letter alleged that the project was "overdeveloped." In particular, Bergen Ridge noted that the project required more than a dozen variances, waivers and exceptions from the Township of North Bergen zoning ordinances, and also a parking variance "for all but about 13 of the 551 proposed parking spaces." The letter also contested the height of the buildings, noting that the proposed tower height was 120 feet. That height, when added to the base elevation of River Road, would cause the project to rise to 134 feet above the Hudson River, a full fourteen feet higher than the highest roof level at Bergen Ridge.
Bergen Ridge then obtained a competing view shed analysis from its own expert, Langen Engineering. Langen's analysis was submitted to the DEP on September *720 15, 2006, along with related comments from Bergen Ridge's counsel.
The analysis included several photographs of the site, along with a depiction of the proposed project superimposed upon the photographs. The photographs were taken from four camera locations along the east border of the Bergen Ridge, the side with the views expected to be most affected by the Riverview project.
The photos in Langen's analysis show that the project will eliminate a substantial amount of the views of the New York City skyline for those homes that are on the north end of Bergen Ridge, looking southeast. However, much of the skyline will apparently still be visible along the rest of the development through gaps in the towers. One camera location on the far south end of Bergen Ridge (camera 20) shows that the Riverview complex would only partially contribute to the obstruction of view on that one side, an obstruction that also includes Bulls Ferry Road and the greenery that surrounds the edge of the road.

Additional Post-Hearing Submissions
Bergen Ridge also submitted to the DEP a competing expert traffic analysis from Michael Maris. Maris anticipated that the project would cause inferior "E" levels of service for right-turn lanes, when vehicles exited out of both the southern and northern driveways of the Riverview complex during the peak morning hour. Additionally, Maris predicted that left turns on the Bulls Ferry Road approach would likewise operate at an "E" level during the peak morning hour. On the whole, Maris opined that the project would violate the traffic criteria of N.J.A.C. 7:7E-8.14.
On July 21, 2006, Bergen Ridge's counsel submitted another letter to the DEP, contesting many aspects of the staff's preliminary analysis. The letter focused on the past illegal filling and clearing activities on the site, as well as the view obstructions and the traffic congestion that would be generated by the proposed project.
Subsequently, Riverview's representatives met with the DEP's staff to discuss compliance issues relating to the project. The record does not provide the date of that meeting, although related correspondence suggests that it took place at some time in September or October 2006. There is no indication that Bergen Ridge's representatives were also present.
We cannot tell from the record whether Bergen Ridge's representatives likewise had any meetings of their own with the DEP about Riverview's permit, or the extent of any substantive telephone conversations they may have had with the agency's staff during that time frame. It is clear, however, that counsel for Bergen Ridge wrote to the DEP on at least three occasions to advocate the residents' position concerning the proposed permit and to provide additional information.

The DEP's Issuance of the Waterfront Development Permit
The DEP approved and issued the waterfront development permit to Riverview on October 23, 2006. At the same time, the DEP released an accompanying environmental report, which detailed why DEP believed the project complied with the pertinent regulations. The report substantially adopted the contents of the DEP staff's earlier preliminary analysis.
Although the DEP's final report acknowledged that "the proposed high-rise towers will block some views of the [horizon], the New York City skyline, and the Hudson River from nearby residential structures[,]" it also recognized that "the longest dimension of the proposed high-rise building will be oriented perpendicular *721 to the coastal waters." That perpendicular orientation, the DEP concluded, would reduce the impact on views from the surrounding properties. Consequently, the DEP concluded "that the proposed high-rise towers have been designed to preserve much of the [view of the] New York City skyline and the Hudson River from nearby residential structures." (Emphasis added).
The final report also deemed acceptable the traffic aspects of the Riverview project. Specifically, the report noted that "[a] new roadway will be constructed on the eastern side of the property to alleviate immediate traffic [e]ffect onto River Road."

Bergen Ridge's Administrative Appeal and Request for an OAL Hearing
In November 2006, Bergen Ridge appealed the waterfront permit approval to the Commissioner, requesting a full adjudicatory hearing on the matter in the OAL. Riverview, meanwhile, did not appeal any of the permit conditions that had been imposed by the DEP.
In its hearing request, Bergen Ridge asserted that "the health, safety and welfare of ... its members are directly impacted by the proposed project." Bergen Ridge claimed that "[t]here is a substantial adverse [e]ffect on the health of the residents as a result of the elimination of the scenic resources and the blocking of views." Bergen Ridge also asserted that "[i]n addition to the adverse [e]ffect on views, the light and air available to Bergen Ridge and its residents, simply put, will be substantially diminished."
Citing Helmstetter's real estate analysis, Bergen Ridge emphasized the expected diminution in the value of its members' units, primarily because of the project's adverse impact on views. Bergen Ridge argued that this anticipated impact reflected a significant property interest that gave it standing to contest the permit.
Bergen Ridge also highlighted the substantive differences between its experts' view shed analysis and traffic analysis with the ones submitted by Riverview's experts. Those material differences, argued Bergen Ridge, justified referral of the dispute to an adjudicatory hearing.
In a responsive letter to the Commissioner, Riverview argued that Bergen Ridge lacked standing to obtain an administrative hearing on the permit. Riverview emphasized that Bergen Ridge had "participated extensively" in the DEP's review of the permit application. In this regard, Riverview pointed to Bergen Ridge's submission of "thousands of pages of reports." Riverview also noted that Bergen Ridge's representatives had provided both written comments and oral testimony at the June 2006 public hearing in North Bergen.
Bergen Ridge submitted a reply to the Commissioner in January 2007, asserting that its residents' interests sufficed under the law to trigger a right to a hearing. In addition, Bergen Ridge substantively criticized the waterfront permit and the DEP associated report. Bergen Ridge argued that the agency had failed to "make adequate factual findings (or any factual findings) that address the evidence presented by [Bergen Ridge], particularly that evidence relating to impairment of protected views and scenic resources, visual access to the waterfront, traffic, high-rise structures and illegal filling on the site."

The Commissioner's Decision
Twenty-one months later,[5] the Commissioner issued a four-page written decision *722 on October 15, 2008, denying Bergen Ridge's hearing request. The Commissioner noted that the Administrative Procedure Act ("APA"), N.J.S.A. 52:14B-3.3, requires that a third party "either [have] a statutory right to a hearing or a constitutionally protected property interest affected by the permit." The Commissioner found that neither of the statutes under which the permit was issued, i.e., the Flood Hazard Area Control Act, N.J.S.A. 58:16A-50 to -68, or the Waterfront Development Act, N.J.S.A. 12:5-1 to -11, granted the residents of Bergen Ridge a right to a hearing.
In her written decision, the Commissioner acknowledged that "[Bergen Ridge] must demonstrate a particularized property interest of constitutional significance that is directly affected by the DEP's permitting decision." In this regard, the Commissioner found that Bergen Ridge's claims of decreased property values, as well as its general complaints of loss of view and of increased traffic, were "`insufficient to demonstrate a particularized property right or other special interest.'" (quoting Spalt v. N.J. Dept. of Envtl. Prot., 237 N.J.Super. 206, 212, 567 A.2d 264 (App.Div.1989), certif. denied, 122 N.J. 140, 584 A.2d 213 (1990)). She concluded that:
[the DEP] implemented its required procedures, which provided [Bergen Ridge] with a process for the submission and consideration of its comments. The concerns expressed by [Bergen Ridge], including impacts on physical and visual access, traffic, and prior fill activities, have been properly considered and addressed by the [DEP] as part of the public's participation in the permitting process. In addition, traffic concerns were also addressed by the township traffic engineer. Accordingly, [Bergen Ridge] has not demonstrated a risk of erroneous deprivation of a particularized property right, and so does not have a constitutional right to a hearing in this matter.

In conclusion, because [Bergen Ridge] lacks any statutory right to an administrative hearing or any constitutional right affected by the permit, it does not have the requisite standing to challenge the permit through an administrative hearing and the request for such a hearing must be DENIED.
[(Emphasis added).]
This appeal followed. Bergen Ridge confines its arguments to the Commissioner's procedural denial of an adjudicatory hearing. It does not appeal the merits of the DEP's decision to issue a permit.[6] Bergen Ridge argues that the discrete impacts of the project upon its residents implicate substantial property interests sufficient to trigger a right to an OAL hearing.
We were advised at oral argument that the project has yet to be built, and that Riverview is in the midst of pursuing necessary approvals from municipal authorities.

II.

A.
A third party's right to a formal administrative hearing to contest the issuance of *723 a permit is defined and circumscribed by the APA, N.J.S.A. 52:14B-1 to -25. The APA strictly limits the situations in which third parties are entitled to such a formal hearing to challenge a permit application.
Section 3.3a of the APA, as amended in 1993, clearly instructs that "[e]xcept as otherwise required by federal law or by statute that specifically allows a third party to appeal a permit decision, a State agency shall not promulgate any rule or regulation that would allow a third party to appeal [administratively] a permit decision." N.J.S.A. 52:14B-3.3a. A third party is defined in the statute as "any person other than: a. [a]n applicant for any agency license, permit, certificate, approval, chapter, registration or other form of permission required by law; b. [a] State agency; or c. [a] person who has a particularized property interest sufficient to require a hearing on constitutional or statutory grounds." N.J.S.A. 52:14B-3.2 (emphasis added).
By enacting these limitations, the Legislature unmistakably intended to prevent the processing of permit applications by State agencies from being bogged down by time-consuming and costly formal hearings in the OAL. To require such formal hearings routinely in every instance where a local resident raises some objection to a proposed State permit could produce enormous delays. Such hearings could easily consume substantial public and private resources. They are also prone to convert an agency's administrative review process into a veritable litigation battleground. See N.J.S.A. 52:14B-3.1 (noting disruptive effects and "chaotic unpredictability and instability" potentially caused to the State's business climate by allowing challenges to permits by third parties "who have no particularized property interests or who are not directly affected by a permitting decision"); see also In re NJPDES Permit No. NJ0025241 Issued to Asbury Park City, 185 N.J. 474, 482, 888 A.2d 454 (2006) (citing the same legislative finding).
On the other hand, the Legislature also recognized the importance of respecting constitutionally or statutorily protected property rights of third parties that can be infringed by the issuance of a permit. Consequently, the APA does not foreclose such third parties from seeking judicial review of the merits of a permit once it is issued by an agency. See N.J.S.A. 52:14B-3.3b ("[n]othing herein shall be construed as abrogating or otherwise limiting any person's constitutional and statutory rights to appeal a permit decision"). "[T]he Legislature's intent was not to interfere with the constitutionally protected right to appeal an agency decision to this court[.]" In re Amico/Tunnel Carwash, 371 N.J.Super. 199, 208, 852 A.2d 277 (App.Div.2004); see also N.J. Const., art. VI, § 5, ¶ 4.
The Legislature has maintained significant avenues for third-party objectors to present their concerns about proposed permits to agency decision-makers before they reach a final determination on a permit application. Under Section 3.1a of the APA, "all interested persons are [to be] afforded reasonable opportunity to submit data, views or arguments, orally or in writing, during any proceedings involving a permit decision[.]" N.J.S.A. 52:14B-3.1a; see also In re Freshwater Wetlands Statewide Gen. Permits, 185 N.J. 452, 463, 888 A.2d 441 (2006) (classifying neighboring homeowners, who feared that their properties might be flooded if the DEP granted a developer a permit to fill wetlands within 200 feet of their homes, as "interested persons" who were entitled under N.J.S.A. 52:14B-3.1a to present their opposition to the agency). To be sure, such oral presentations and written submissions are less formal than a contested case tried before *724 an Administrative Law Judge ("ALJ"). Even so, they can provide an effective and efficient means for third-party objectors to voice their concerns with the State officials who will make the ultimate permitting decision.

B.
The reported cases evaluating a third party's claimed right to a formal agency hearing have turned upon the relative strength of the property interests that the third party invoked. The more general and attenuated that property interest is, the less likely that it will be sufficient to trigger a hearing under the statute. Fundamentally, "the party affected by the administrative action [must] have a safeguarded interest." Cunningham v. Dept. of Civil Serv., 69 N.J. 13, 24, 350 A.2d 58 (1975) (outlining the contours of an administrative agency's quasi-adjudicative functions). "Particularized property rights or other special interests must exist." Ibid.
For example, in Normandy Beach Improvement Ass'n v. Comm'r, 193 N.J.Super. 57, 472 A.2d 156 (App.Div.1983), certif. denied, 96 N.J. 305, 475 A.2d 596 (1984), a group of property owners opposed the DEP's issuance of a Coastal Area Facility Review Act ("CAFRA") permit to a county utilities authority that had sought to build a sewerage pumping station near the residents' homes. The objecting homeowners asserted that "the quality of their lives would be adversely affected by the proposed pumping station[.]" Id. at 61, 472 A.2d 156. To buttress their contentions, the objectors retained a real estate expert, who opined that "the station would have a detrimental effect on the economic values of the homes in the area." Ibid.
We rejected the homeowners' claim in Normandy Beach that their interests rose to such a level as to require the DEP to conduct a formal administrative hearing in considering their opposition. We observed that if those interests triggered a right to a formal hearing, such an approach would have adverse "far-reaching consequences":
Plaintiff's contention of entitlement to an evidentiary hearing, if adopted, would have far-reaching consequences. It has become common for property owners within the vicinity of a proposed governmental facility to join together to express their concern and to offer strong objection, whether the proposed facility be a prison, mental institution, drug-treatment center, highway, or anything else. The joint or individual rights of property owners to be heard should be respected, but we have been offered no support for the proposition that whenever a proposed governmental project will affect property owners within an indeterminate radius of the project, each owner or group of owners must be entitled to a full evidentiary hearing.
[Id. at 61, 472 A.2d 156.]
Although the DEP did not provide the objectors in Normandy Beach with a full-blown evidentiary hearing and the chance to cross-examine witnesses, the DEP did hold a public session on the permit that lasted several hours. Thirteen objectors spoke in opposition to the permit, including presentations from experts retained by the homeowners, which were supplemented by sixty letters of opposition. Id. at 62, 472 A.2d 156. We held that the procedure amply comported with norms of due process and of fundamental fairness, as well as with the procedural requirements of the CAFRA statute. Id. at 63, 472 A.2d 156.
Later, in Spalt, supra, 237 N.J.Super. at 206, 567 A.2d 264, we considered whether the plaintiffs had a statutory or constitutional right to a formal administrative hearing contesting a CAFRA permit application. The application had been filed by *725 a builder who sought to redevelop an existing marina near Barnegat Bay and construct 134 residential units and 208 new boat slips. The plaintiffs in Spalt were leaseholders of shellfish beds in the bay, professional fishermen, area property owners, and a citizen's coalition advocating preservation of the bay. We rejected the plaintiffs' arguments that they had sufficient property interests to warrant a formal hearing in the OAL on their opposition to the permit.
As to the neighboring property owners in Spalt, we held that "simply because some of the plaintiffs reside close to the proposed [project] site and are fearful of resultant injury to their property, does not mean they are entitled to an adjudicatory hearing." Id. at 212, 567 A.2d 264. "Fear of damage to one's recreational interest or generalized property rights shared with other property owners is insufficient to demonstrate a particularized property right or other special interest." Ibid. In addition, we found insufficient the commercial fishermen's claim that the proposed development would deprive them of a particularized property right to pursue their occupations. Id. at 213-14, 567 A.2d 264. The fact that the fishermen, as a result of the CAFRA permit being issued, would have to travel a longer distance to get to the nearest suitable shellfish bed did not amount to a cognizable deprivation of their right to work, but rather only a loss of the ability "to work at a particular job site." Id. at 214, 567 A.2d 264.
Subsequently, in Amico/Tunnel Carwash, supra, 371 N.J.Super. at 199, 852 A.2d 277, we held that neighboring residents had no right to an OAL hearing to contest a permit granted by the Meadowlands Commission to a service station owner who wanted to add a car wash to his existing business operations on the site. The residents asserted that their use and enjoyment of their own properties would be adversely affected by the new car wash, particularly because it would increase nearby traffic congestion. Id. at 212, 852 A.2d 277. We found this asserted interest inadequate to confer a right to a hearing. Ibid. In particular, we observed that the "anticipated impact from Amico's proposed development is similar to the impacts commonly experienced by owners of property in the vicinity of any proposed new development." Ibid.
Our Supreme Court has reinforced these principles. In Freshwater Wetlands, supra, 185 N.J. at 464, 888 A.2d 441, the Court ruled that the possible exacerbation of flooding conditions upon nearby property was too speculative of any injury to provide the neighboring landowners with a right to an OAL hearing to challenge a wetlands permit. The Court characterized the interests of the neighbors as "inchoate" and insufficient to trigger a right to a formal hearing. Ibid. The Court held that the objectors had not been deprived of a constitutionally-protected interest by the DEP's handling of the permit application. Id. at 456, 888 A.2d 441. It found that the DEP's administrative review, even in the absence of a "trial type" hearing, comported with norms of due process. Id. at 472-74, 888 A.2d 441. In that regard, the Court noted that the DEP had provided administrative due process through "a painstaking" review, which included "consideration of the neighbors' firsthand accounts of flooding conditions; review of the objectors' expert reports; on-site visits; and meeting with the objectors, their expert, and their attorneys." Id. at 473, 888 A.2d 441.
On the other hand, the Court underscored in Freshwater Wetlands the administrative burdens upon the agency and the "economic hardships that would have been borne by the permit applicant" if it were *726 required to undergo a formal hearing. Ibid. The Court recognized the substantial nature of these burdens, and that "[e]xcessive administrative barriers in the permitting process can stifle legitimate growth and development." Ibid.
The Court also pointed out in Freshwater Wetlands that the neighbors had the opportunity to present their objections to the project at the municipal level before the local planning board. In fact, the planning board had conducted fourteen sessions on the matter, including presentations from the objectors and their expert and presumably the cross-examination of the applicant's witnesses under N.J.S.A. 40:55D-10d. Id. at 466, 888 A.2d 441.

C.
Here, the residential objectors from Bergen Ridge acknowledge that they have no statutory right to an OAL hearing explicitly guaranteed to them under the Waterfront Development Act or under the Flood Hazard Area Control Act. They nonetheless maintain that they have "a particularized property interest sufficient to require a hearing," mainly because of the direct adverse impact that the Riverview towers will have upon their views of the Hudson River and the New York City skyline. They emphasize that their real estate expert has projected, on average, a twenty percent reduction in the values of their homes, depending upon the amount of curtailment of the scenic views from each particular unit. As a secondary point, the residents also cite the adverse impact that the Riverview project could have upon traffic into and out of their own development, and upon the nearby road systems.
Recognizing the implications of existing case law, Bergen Ridge invites us to fashion an exception in this case, one that it claims will distinguish the present circumstances from those in the reported cases where an OAL hearing was denied. In particular, Bergen Ridge's brief suggests the following aspects that might set the present scenario apart from those in prior cases denying a hearing: (1) "[d]irect and specific impact to value or other components of the use and enjoyment of its property[;]" (2) "[i]dentifiable and concrete harm suffered, including economic devaluation, but also identifiable and real interference with the use and enjoyment of the property[;]" (3) "[c]lose proximity to the development giving rise to direct and immediate rather than indirect, tangential, or speculative harm[;]" (4) "[s]ignificant harm not shared in common with other members of the public[;]" signifying that "the harm relates specifically to this property[;]" and (5) "[c]laims based upon specific regulatory provisions designed to protect the interest being abridged."
Under this proposed reformulation of the legal standard, Bergen Ridge contends that it has distinctively strong, property-based interests in preserving scenic views and in alleviating traffic flow. These special interests, according to Bergen Ridge, suffice to create a right to a formal hearing under the APA.

D.
We consider Bergen Ridge's contentions of entitlement to a hearing, first and foremost with respect to the anticipated loss of scenic views and, second, with respect to the alleged negative traffic impacts.

1.
As a well-settled matter of law, "in the absence of a restrictive covenant, a property owner has no right to an unobstructed view across a neighbor's property." Bubis v. Kassin, 323 N.J.Super. 601, 616, 733 A.2d 1232 (App.Div.1999) (citing Harwood v. Tompkins, 24 N.J.L. 425, 427 *727 (1854)). In Bubis, the residents of homes located on inland lots near the ocean complained that a developer had built a sand berm on oceanfront lots where a private beach club had formerly existed. The sand berm was twelve to fourteen feet high. One of the plaintiffs, Bubis, resided directly across from the defendants' oceanfront property. The plaintiffs contended that the erection of the sand berm interfered with their ability to access the beach and ocean. They further contended that the new construction interfered with their alleged right to an "unobstructed view" of the Atlantic Ocean. Id. at 606, 733 A.2d 1232. The plaintiffs sought injunctive relief against the developer and the DEP, seeking to remove the sand berm and to halt further construction, relief which the trial court denied.
We held in Bubis that the relevant deeds to the plaintiffs' predecessors in title created implied private easements that afforded them access to the beach and the ocean, and that subsequent erosion had not eradicated those easements. Id. at 609, 733 A.2d 1232. We also noted that the defendants had possibly violated a restrictive covenant in the deeds prohibiting any fence more than four feet high. Id. at 615-16, 733 A.2d 1232.
Consequently, we remanded for further proceedings in Bubis to develop a remedy for the violation of the easements and covenants set forth in the recorded property instruments. In doing so, however, we rejected other claims by the plaintiffs, including their specific claim that the sand berm constituted an actionable nuisance because it obstructed their residential views of the ocean. In that regard, we noted that the then-applicable CAFRA regulation, then codified at N.J.A.C. 7:7E-8.11(b),[7] only required that development adjacent to coastal waters provide access to the waterfront "to the maximum extent practicable." Id. at 617, 733 A.2d 1232. The CAFRA regulation did not "impose an absolute prohibition against oceanfront development which interferes with the view of inland property owners." Ibid.
On appeal after our remand, the Supreme Court modified our disposition and found that the berm constituted a fence and therefore also violated the restrictive covenant. Bubis v. Kassin, 184 N.J. 612, 630-31, 878 A.2d 815 (2005). The Court left intact, however, our declaration that in the absence of such a covenant or deed provision, a neighboring landowner has no right under property law to prevent such view obstructions created on other property. Ibid.
The high-rise structure regulations implicated in this case, N.J.A.C. 7:7E-7.14, likewise do not create an absolute prohibition against coastal development interfering with the views of inland residents. Although the precise statutory basis for the high-rise regulations under the Waterfront Development Act and/or CAFRA is not entirely clear,[8] the pertinent regulatory history indicates that the regulations were substantially amended to their present form in 1990, so as to "provide more detailed guidance concerning the location acceptability of high[-]rise structures, especially along the waterfronts." 22 N.J.R. 1191. Among other things, the provisions are aimed to "prevent the build-up of high[-]rise buildings closely aligned along the coastline." Ibid. In particular, the *728 regulations are intended to "permit the construction of high[-]rises only at portions of a waterfront area where these structures could serve as a focal point of a community, induce economic growth and generate additional water-oriented attractions to complement the natural amenities of a waterfront for public use." Ibid.[9]
As we have already noted, the high-rise development regulations prescribe that the "longest lateral dimension of any high[-]rise structure must be oriented perpendicular to the beach or coastal waters," see N.J.A.C. 7:7E-7.14(b)3, a requirement that the three towers in the proposed Riverview complex would apparently satisfy. The high-rise regulations further provide that the proposed structure "must not block the view of dunes, beaches, horizons, skylines, rivers, inlets, bays, or oceans that are currently enjoyed from existing residential structures, public roads or pathways, to the maximum extent practicable[.]" N.J.A.C. 7:7E-7.14(b)4 (emphasis added). More generically, "[t]he proposed structure must not have an adverse impact on air quality, traffic and existing infrastructure." N.J.A.C. 7:7E-7.14(b)7.
Apart from these requirements expressed in the high-rise provisions, other parts of the waterfront development regulations reflect a desire to promote coastal development "that is visually compatible with its surroundings in terms of building and site design," and to encourage waterfront project design that "enhances scenic resources[.]" See N.J.A.C. 7:7E-8.12(c). In this regard, the waterfront regulations define "scenic resources" to include "views of the natural and/or built landscape." N.J.A.C. 7:7E-8.12(a).
We had occasion to refer to these waterfront regulations, albeit in a somewhat different context, in In re Waterfront Dev. Permit No. WD88-0443-1, Lincoln Harbor Final Dev., Weehawken, Hudson County, 244 N.J.Super. 426, 582 A.2d 1018 (App.Div.1990), certif. denied, 126 N.J. 320, 598 A.2d 880 (1991) ("Waterfront Permit"). That appeal arose after the DEP had issued a waterfront development permit to a developer, authorizing it to complete final construction of a project along the Hudson River in Weehawken. The DEP Commissioner had issued the permit with his personal authorization. In doing so, the Commissioner displaced the normal approval functions of the DEP's Division of Coastal Resources, which is entrusted under the regulations with the power to issue waterfront permits under N.J.A.C. 7:7-1.5(a). Id. at 428, 582 A.2d 1018.
The appellant in Waterfront Permit, a non-profit environmental group focused upon coastal and marine life issues, challenged the Commissioner's issuance of a permit as procedurally ultra vires. Ibid. Substantively, the appellant contended that the proposed construction would "obscure the scenic view of the Hudson River and New York City skyline" from the Lincoln Tunnel Helix and from local streets in Weehawken. Ibid. In detailing the appellant's objections to the view-obstructing aspects of the project, we noted that "[t]he vista, which has been described as `spectacular,' is now enjoyed by hundreds of thousands of bus and car passengers every day." Id. at 429, 582 A.2d 1018. Although portions of the scenic view would remain intact, "its panoramic beauty will be substantially lost," except to the eventual tenants of the new project. Ibid.
We concluded in Waterfront Permit that the environmental group had standing to *729 challenge the merits of the permit on an appeal to this court. Id. at 437-38, 582 A.2d 1018. We recognized that the appellant presented regional concerns on behalf of commuters and other travelers. Those regional concerns, to some extent, conflicted with the preferences of many local residents, who supported the project as a commercial tax ratable and who generally gained access to the Lincoln Tunnel through local roads rather than through the scenic path of the Helix. Ibid.
Even so, we emphatically rejected the appellant's claim that it was entitled to a formal hearing in the OAL concerning the waterfront permit. We observed that "[t]he rule is firmly settled that a trial-type adjudicatory hearing is not allowed in such matters except to an appellant who can show a statutory right or a constitutionally protected property interest." Id. at 436, 582 A.2d 1018. The appellant identified no such statutory authority, and it also "fail[ed] to show any particularized property interest protected by [the] state or federal Constitution that ha[d] been impaired by [the] DEP's action." Id. at 436-37, 582 A.2d 1018.
We reach the same conclusion in the present case. Although Bergen Ridge is a homeowner's association rather than an environmental organization, its members' comparable desire to maintain unimpeded scenic views of the Hudson River and the New York City skyline does not amount to a constitutionally-protected property interest entitling them under N.J.S.A. 52:14B-3.3 to a formal OAL hearing to contest Riverview's permit. Absent an enforceable deed restriction or easement, the Bergen Ridge residents have no property right to prevent any party  whether it be a private or public developer  from building a zoning-compliant[10] structure that will block their vistas of the Hudson River or of New York City.
The DEP's high-rise regulations undoubtedly embrace a goal of protecting scenic views of the waterfront. However, that protection is qualified in N.J.A.C. 7:7E-7.14 by the phrase "to the maximum extent practicable." That qualification reflects a balanced regulatory sensitivity to the physical, economic, and other pragmatic constraints that affect waterfront construction.
We are mindful that residents of Bergen Ridge with views of the waterfront may well have paid a premium to purchase units with more desirable vistas of the skyline and waterfront. We fully appreciate the magnificence of the New York City skyline, whether it is viewed from Weehawken or from North Bergen. We also do not ignore the real estate expert's projection estimating that the Bergen Ridge unit owners are apt to sustain a loss of one-fifth of their property values because of the blockage of views caused by the Riverview project. The DEP was obligated to weigh these competing interests in evaluating the proposed configuration of the project, and in considering whether it maintains such scenic views "to the maximum extent practicable."
Nevertheless, the collateral economic impacts upon surrounding properties caused by the siting of an otherwise-lawful building are part and parcel of the social compact. They result from the unavoidable interrelatedness of living in a world surrounded by other persons and by other things.
If we were to hold that such collateral economic impacts automatically entitled *730 neighboring property owners to a formal hearing in the OAL each time a State permit is issued for, say, a sewerage treatment plant, a group home, a new prison, or some other building that could depress surrounding property values, the construction of those and other important structures might be thwarted or unduly delayed, at great cost to the public. That surely would be contrary to the interests of the citizens as a whole. The Legislature recognized this problem by adopting strict limitations on third-party hearing rights in the APA.
Although the townhouse residents in this case argue that their interests in enjoying scenic views are special and unique, the high-rise regulations at the core of this matter do not treat them as such. N.J.A.C. 7:7E-7.14(b)4 instructs that, subject to practical constraints, waterfront projects should not only avoid blocking views that are "currently enjoyed from existing residential structures," but also should not block such views enjoyed from "public roads" and from "pathways." The regulations do not exalt the scenic views of full-time residents over those enjoyed by pedestrians, motorists, bicyclists, hikers, visitors, or by other persons who simply may be taking a pleasant hillside stroll on a clear day. We held in Waterfront Permit that such non-residents did not have a right to an OAL hearing. We do not think the regulatory scheme justifies preferential treatment for objectors who happen to hold a deed or a lease to premises that enjoy the same scenic vista.
In short, the townhouse owners at Bergen Ridge have no exclusive proprietary interest in the scenic views that they have enjoyed from their dwellings. As Judge Alex Kozinski of the United States Court of Appeals for the Ninth Circuit aptly wrote:
As the saying goes, some of the best things in life are free, and the reason may be that they cannot be reduced to possession: The air we breathe, scenic views, the night sky, the theory of relativity and the friendship of others cannot be reduced to possession and therefore cannot be the basis of property rights.

[G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., 958 F.2d 896, 903 n. 12 (9th Cir.1992) (emphasis added).]
Moreover, absent a statutory provision that expressly confers a right to a hearing, an administrative agency cannot create such a right by mere regulation, because doing so would violate the Legislature's clear prohibition within the APA. See N.J.S.A. 52:14B-3.3a; see also Amico/Tunnel Carwash, 371 N.J.Super. at 208, 852 A.2d 277.
That all being said, we understand why the residents of Bergen Ridge are upset about this project and why they feel they have a right to be heard in opposition to it.[11] Yet those residents received substantial attention in the administrative process within the DEP in a variety of ways, short of a trial-type OAL hearing. That attention is manifested by the June 2006 public session and Thonet's related PowerPoint presentation, the consideration of written comments from Bergen Ridge's experts and representatives, and the multiple communications between the DEP staff and Bergen Ridge's counsel.
On the whole, the residents received ample process that arguably was constitutionally due to them. See Mathews v. Eldridge, 424 U.S. 319, 348-49, 96 S.Ct. *731 893, 909, 47 L.Ed.2d 18, 41-42 (1976).[12] We also are cognizant, as was the Supreme Court in Freshwater Wetlands, that the neighbors objecting to the project still retain a right to be heard by the local land use boards in North Bergen, albeit with respect to somewhat different substantive standards.
We decline the invitation by Bergen Ridge's counsel to formulate a fact-based distinction setting this case apart from other precedents in which a right to a hearing has been rejected. The five distinguishing factors proposed by appellant are simply too vague and amorphous to justify providing a hearing in this case.
The factors suggested by appellant present intractable issues of line-drawing. To trigger a hearing right, is it enough that a unit owner's view of the New York City skyline and the Hudson River is only partially blocked? Blocked from a unit's bay window in the family room but not from a side window in the dining room? Blocked as to lower Manhattan but not as to Midtown? Blocked for a person under six feet tall but not as to a taller person? The possible gradations are endless. We decline to attempt such fine-tuned classifications. See Jansson v. Fairleigh Dickinson Univ., 198 N.J.Super. 190, 196, 486 A.2d 920 (App.Div.1985) (underscoring the peril of having "the efficacy of our rules [of law] destroyed by the gradual cumulation of exceptions"). We instead affirm the Commissioner's finding that appellants' asserted interests here simply fall short of the mark.

2.
Bergen Ridge's concerns about local traffic impacts likewise do not create a sufficient property interest to entitle the homeowners to an OAL hearing. We rejected similar traffic-based contentions in Amico/Tunnel Carwash, supra, 371 N.J.Super. at 212, 852 A.2d 277, and see no reason to depart from that analysis here.
The traffic impacts to the area resulting from the Riverview project will not be unique to the residents of Bergen Ridge. We agree with the DEP that those traffic impacts do not infringe upon a "particularized property interest sufficient to require a hearing on constitutional or statutory grounds." N.J.S.A. 52:14B-3.2c.

III.
For all of these reasons, we affirm the Commissioner's final decision dated October 15, 2008, denying Bergen Ridge a trial-type hearing in the OAL.
NOTES
[1] The water quality and stormwater management reports are not particularly significant to the present appeal, as Bergen Ridge has almost exclusively focused upon the impact of the project to the neighbors' views of the river and New York City skyline as well as on issues of traffic congestion.
[2] A view shed analysis consists of a group of "[p]hotographs showing the specific location of the proposed development taken from a minimum of four different locations and labeled as to orientation." N.J.A.C. 7:7-4.2(a)(5).
[3] As defined in the State Highway Access Management Code, a "[l]evel of service" is "a description of traffic conditions along a given roadway or at a particular intersection. The level of service ranges from `A', which is the best, to `F', which is the worst. It reflects factors such as speed, travel time, freedom to maneuver, traffic interruptions, and delay." N.J.A.C. 16:47-1.1.

For signalized intersections, a "D" level of service refers to a delay of between 35 and 55 seconds, while an "E" level of service refers to a delay of between 55 and 80 seconds per vehicle. For an unsignalized intersection, the same respective levels of service correspond to delays of between 25 and 35 seconds for "D" and between 35 and 50 seconds for an "E" rating.
[4] The parties have not furnished us with a copy of any written inspection report from Bearce.
[5] There is no explanation in the record for the considerable delay from the parties' last communication in January 2007 with the DEP about the hearing request and the Commissioner's final decision in October 2008 denying such a hearing.
[6] We note that in a separate appeal by a public interest organization, NY/NJ Baykeeper, the merits of the permit decision are being challenged as arbitrary and capricious. See In re Riverview Development, LLC Waterfront Development Permit XXXX-XX-XXXX.3 WFD 060001, No. A-5952-08T2. Bergen Ridge is not a party to that other appeal, and no party moved to consolidate the two appeals.
[7] The regulation that was cited by this court in Bubis was repealed in 2007 and substituted with a regulation discussing the application of public trust rights to coastal development. See 39 N.J.R. 5222(a); N.J.A.C. 7:7E-8.11.
[8] We note that no party to the present appeal has challenged the DEP's statutory authority to adopt the high-rise regulations.
[9] Except for these general statements of policy, the sparse legislative and regulatory history that we can find is otherwise unenlightening about the genesis of the view-preservation aspects of N.J.A.C. 7:7E-7.14.
[10] We do not, of course, pass upon the merits of whatever variance or site plan applications that Riverview is presenting or will present to the North Bergen zoning and planning boards.
[11] Nothing we say in this opinion should be construed as any indication about the merits of the permit approval, which are not before us.
[12] We do not understand why a formal denial of their request for an OAL hearing took the DEP twenty-one months to generate, particularly given the well-established legal principles applicable to this subject. Even so, we do not believe the delay caused any substantial prejudice to the residents.