**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4483-17T2

IN THE MATTER OF
JSTAR, LLC,

      Appellant,

v.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION -
LAND USE REGULATION
PROGRAM, and OSBORN SEA BAY
CONDOMINIUM ASSOCIATION,
NOS. 15006-04-0203.7 CAF 17001,

      Respondents.

_____

Submitted November 12, 2019 – Decided April 27, 2020

Before Judges Rothstadt, Moynihan and Mitterhoff.

On appeal from the New Jersey Department of Environmental Protection, Agency No. 1506-04-0203.7 CAF 170001.

R.C. Shea & Associates, attorneys for appellant (Robert C. Shea, of counsel and on the briefs; Dina M. Vicari and Robert C. Shea, II, on the briefs).

Giordano, Halleran & Ciesla, PC, attorneys for respondent Osborn Sea-Bay Condominium Association (Adam Garcia, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Department of Environmental Protection (Melissa H. Raksa, Assistant Attorney General, of counsel; Jason Brandon Kane, Deputy Attorney General, on the brief).

PER CURIAM

JSTAR LLC (JSTAR) appeals from the New Jersey Department of Environmental Protection's (DEP) April 11, 2018 final agency decision, granting a Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21, Individual Permit to Osborn Sea-Bay Condominium Association (OSBCA). The permit was issued in connection with OSBCA's proposal to reconstruct a portion of a residential development in Brick Township which lies north of JSTAR's property, that was commonly known as "Camp Osborn," and had been destroyed by Superstorm Sandy.

On appeal, JSTAR contends that (1) OSBCA's notice of its CAFRA application was defective because its project description failed to include a portion of a road abutting OSBCA's property; (2) JSTAR and other members of the public, were not afforded adequate procedural due process in voicing their concerns about the project; (3) the DEP's grant of the CAFRA permit was

2

arbitrary, capricious, or unreasonable; and (4) OSBCA should be precluded from filing a modification of its CAFRA permit. We affirm, as we conclude that the DEP's grant of the permit was not arbitrary, capricious or unreasonable and JSTAR's arguments to the contrary are without merit.

## I.

### The Property

OSBCA's site for Camp Osborn is comprised of 3.49 acres, designated by Brick Township as Block 36, Lots 13, 18, 22, and 24, and are situated alongside State Route 35. JSTAR owns the property on Lots 11.06 and 11.07 in the same block. To the north of Camp Osborn lies the Ocean Club Condominiums (OCC), to the south is undeveloped land in Lot 12,[1] to the west is Route 35, and to the east is the United States Army Corps. of Engineers (Army Corps.) dune project adjacent to the beach.

Two internal roads—Shell Road and Elder Road—provide access to Camp Osborn. To the immediate south of OSBCA's site, on Block 36, Lot 12, lies Cummings Street, which runs east-west from Route 35.[2] The road was also

---

[1] The property on Lot 12 previously was improved by a condominium.

[2] The parties sometimes referred to "Cummings Street" as "Cummins Street." By all accounts and documentation, including the "Preliminary and Final Major

destroyed by Superstorm Sandy. The property on the other side of Cummings Street on Lot 12 is owned by RTS IV, LLC (RTS).[3]

## The Project

The proposed development consists of sixty-seven residential units, access roads, and beach-access walkways for the community's members as well as the general public. As part of the redevelopment, OSBCA would reconstruct Shell and Elder roads and create an additional portion of Cummings Street running north-south within OSBCA's property, perpendicular to the existing street, to connect Shell and Elder roads to the east-west portion of Cummings Street running along the south side of OSBCA's property.

---

Site Plan," the "Geometry Plan," and the "Grading Plan," the name of the road is "Cummings Street."

[3] RTS was a respondent to JSTAR's first appeal from the issuing of a CAFRA permit for the redevelopment of Lot 12. See Semprivivo v. N.J. Dep't of Envtl. Prot. Land Use Regulation Program, No. A-4537-16 (App. Div. May 21, 2018). That appeal related to RTS's proposed construction of a seven residential unit development, called Osborn Estates, on the 1.405 acre site situated south of OSBCA's site in Lot 12.

In that matter, in response to the DEP's motion, we remanded the dispute to the DEP on May 21, 2018, and did not retain jurisdiction. The appeal from the DEP's decision again granting a CAFRA permit to RTS is pending before us. See JSTAR, LLC v N.J. Dep't of Envtl., Prot. Land Use Regulation Program, No. A-1745-18.

A-4483-17T2

## The CAFRA Application

On October 27, 2017, OSBCA filed an application for a CAFRA Individual Permit, which included site photographs, an Environmental Impact Statement (EIS), a Compliance Statement, and a Stormwater Management Summary. As part of its application, OSBCA secured various easements allowing it to build over the sand dunes to the east and traverse the property to the south.

The DEP published receipt of OSBCA's application in its November 15, 2017 Bulletin.[4] For its part, OSBCA mailed notice of its application to the Brick Township clerk, construction official, and planning board, the Ocean County planning board and its soil conservation district, and to neighboring property owners within 200 feet of OSBCA's site as determined by a list prepared by Brick Township officials. OSBCA also published notice of its application in a local newspaper.

On November 27, 2017, after an initial review and consideration of OSBCA's proposal under the applicable Coastal Zone Management (CZM) Rules, N.J.A.C. 7:7-1.1 to -29.10, the DEP sent engineering comments to

---

[4] The DEP publishes the Bulletin on a semi-monthly basis and it contains a list of environmental and construction permit applications recently filed or acted upon by DEP.

OSBCA so that OSBCA could modify its plan and application to conform to the DEP's Stormwater Management rules, N.J.A.C. 7:8-1.1 to -6.3, and Flood Hazard Area Control Act (FHACA) rules, N.J.A.C. 7:13-1.1 to -24.11. The DEP required OSBCA to amend its submission to add additional information, including the flood hazard area elevation within the site's AO zone,[5] the minimum elevation of the finished floors of the dwellings in each flood zone, the flood hazard elevation for each flood zone, and notes about garages, foyers, and basements. OSBCA was also required to explain, with a "detailed demonstration," why the internal roadways could not be constructed at least one foot above the regulatory flood hazard area elevation. Finally, the DEP required signage indicating the area was subject to flooding.

In another DEP Bulletin, the DEP published that the public comment period for OSBCA's proposed development began on December 20, 2017, and ran until January 29, 2018. By December 14, 2017, OSBCA had mailed notices to all municipal entities and neighboring property owners within 200 feet of the development site indicating the public comment period was beginning. OSBCA

---

[5] According to the Federal Emergency Management Agency (FEMA), Zone AO is an area "subject to inundation by [one]-percent-annual-chance shallow flooding . . . where average depths are between one and three feet." Zone AO, FEMA, https://www.fema.gov/zone-ao (last updated May 23, 2019).

also published notice of the start of the public comment period in the local newspaper.

In response to the notice about the public comment period, the DEP received three objections. The OCC objected both to the wooden walkways that would be used to provide beach access and to the proximity of the northern beach access to its property line. The Presutti family, who were members of OSBCA, objected to the OSBCA design plan, the proximity of road setbacks to proposed units, the number of beach access points for the development, the lack of access to the homes identified on Cummings Street, and they explained a dispute they had with OSBCA's board.

The third objection came from JSTAR. JSTAR objected to the location of the beach access walkways, stating they encroached on the Army Corps's dune construction initiative, and they requested Army Corps approval of the walkways. JSTAR also had concerns about the proposed construction of the north-south Cummings Street extension and its alleged non-compliance with flood hazard regulation. JSTAR further stated the size and configuration of OSBCA's development exceeded any "reasonable use" for the property and that the construction might impact the integrity of the sand dunes to the east. Last,

JSTAR stated the "light, air and space" of the adjacent residential homes would be significantly impacted if OSBCA were permitted to build.

On March 8, 2018, OSBCA submitted a revised plan and application, adding the notes required by the DEP and submitting an addendum to its compliance statement, in which OSBCA explained it could not raise the internal roadways one foot above the flood hazard elevation because the site abutted Route 35 to the west. Since Route 35 is within an AO zone and is only elevated to five feet, there was no way to raise the project's roads one foot above the flood hazard elevation and still provide vehicular access off the island. OSBCA also complied with a request from the DEP that it use I-5 aggregate material and split-rail fencing instead of the timber for the beach access walkways that OCC objected to in its submission.

The DEP reviewed OSBCA's revised submission and reviewed its own environmental and engineering reports. The environmental report confirmed that OSBCA's modified plan conformed with all applicable regulations, including the CZM rules pertaining to impervious coverage limits, development near sand dunes, vegetative cover percentages, secondary impacts, public access, and CAFRA policies. The engineering report indicated OSBCA's

proposal complied with the engineering requirements of the FHACA rules, including those about elevation of dwellings and roadways.

On April 11, 2018, the DEP granted the CAFRA Individual Permit, authorizing OSBCA to reconstruct Camp Osborne under and in compliance with the CZM rules.  This appeal followed.

## II.

At the outset, we observe that our review of a final administrative agency decision is limited.  Stein v. Dep't of Law & Pub. Safety, 458 N.J. Super. 91, 99 (App. Div.) (citing In re Stallworth, 208 N.J. 182, 194 (2011)), cert. denied, 238 N.J. 425 (2019).  We will uphold an agency's decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record."  J.B. v. N.J. State Parole Bd., 229 N.J. 21, 43 (2017) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)).  "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action."  In re Adoption of Amendments to Ne., Upper Raritan, Sussex Cty. & Upper Del. Water Quality Mgmt. Plans, 435 N.J. Super. 571, 582 (App. Div. 2014) (alteration in original) (quoting In re Arenas, 385 N.J. Super. 440, 443-44 (2006)).

In our review we are bound by an agency's findings of fact "when supported by adequate, substantial and credible evidence." In re Taylor, 158 N.J. 644, 656 (1999) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). And, we will "not substitute [our] judgment for the expertise of an agency 'so long as that action is statutorily authorized and not otherwise defective because [it is] arbitrary or unreasonable.'" Williams v. Dep't of Human Servs., 116 N.J. 102, 107 (1989) (quoting Dougherty v. Dep't of Human Servs., Div. of Med. Assistance & Health Servs., 91 N.J. 1, 12 (1982)). Thus, our appellate review does not encompass whether the agency's decision was wise, only whether it was lawful.

In evaluating whether a decision was arbitrary, capricious, or unreasonable, we examine:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Stallworth, 208 N.J. at 194 (quoting In re Carter, 191 N.J. 474, 482-83 (2007)).]

In our review, we defer to an agency's expertise. As we have observed:

> [J]udicial deference to administrative agencies stems from the recognition that agencies have the specialized expertise necessary to . . . deal[] with technical matters and are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues . . . .' "[W]here there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs." The court "may not vacate an agency determination because of doubts as to its wisdom or because the record may support more than one result," but is "obliged to give due deference to the view of those charged with the responsibility of implementing legislative programs."
>
> [In re Adoption of Amendments to Ne., Upper Raritan, Sussex Cty. & Upper Del. Water Quality Mgmt. Plans, 435 N.J. Super. at 583-84 (alterations in original) (citations omitted).]

For those reasons, where an agency's expertise is a factor, we will defer to that expertise, particularly in cases involving technical matters within the agency's special competence. In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 489 (2004). This deference is even stronger when the agency, like the DEP, "has been delegated discretion to determine the specialized and technical procedures for its tasks." City of Newark v. Nat. Res. Council, Dep't of Envtl. Prot., 82 N.J. 530, 540 (1980). Moreover,

> [w]hen an administrative agency interprets and applies a statute it is charged with administering in a manner

that is reasonable, not arbitrary or capricious, and not contrary to the evident purpose of the statute, that interpretation should be upheld, irrespective of how the forum court would interpret the same statute in the absence of regulatory history.

[Reck v. Dir., Div. of Taxation, 345 N.J. Super. 443, 448 (App. Div. 2001) (quoting Blecker v. State, 323 N.J. Super. 434, 442 (App. Div. 1999)), aff'd o.b., 175 N.J. 54 (2002).]

We are therefore "obliged to give due deference to the view of those charged with the responsibility of implementing legislative programs." In re Reallocation of Prob. Officer, 441 N.J. Super. 434, 444 (App. Div. 2015) (quoting In re N.J. Pinelands Comm'n Resolution PC4-00-89, 356 N.J. Super. 363, 372 (App. Div. 2003)).

Despite our deference, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." US Bank, N.A. v. Hough, 210 N.J. 187, 200 (2012) (quoting Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48 (2007)). "When 'the issue involves the interpretation of statutes and regulations, it is a purely legal issue, which [is] consider[ed] de novo.'" Pinelands Pres. All. v. N.J. Dep't of Envtl. Prot., 436 N.J. Super. 510, 524-25 (2014) (quoting Klawitter v. City of Trenton, 395 N.J. Super. 302, 318 (App. Div. 2007)).

A-4483-17T2

III.

Notice

Applying our deferential standard, we begin our review by addressing JSTAR's claim that OSBCA's notices were defective because they did not address the existing east-west portion of Cummings Street. Those alleged defects included OSBCA's failure to advise that Cummings Street was the only access to seven buildings in the development even though they were located outside OSBCA's property and owned by RTS. According to JSTAR, the defects in the notice deprived the DEP of "jurisdiction to consider the OSBCA [a]pplication." We disagree.

The notice provisions of the CZM rules that the DEP implemented under CAFRA governed OSBCA's application. See N.J.A.C. 7:7-24.3 and -24.4.[6] Under N.J.A.C. 7:7-24.3(b), notice of the application must be sent to (1) the municipal construction official where the site is located, (2) the environmental commission, or another agency with similar responsibilities where the site is located, (3) the planning board of each municipality where the site is located, (4) the planning

---

[6] Section 24.3 contains the notice requirements for various applications, including general permit and individual permit applications. Section 24.4 contains "additional requirements" for an application for a CAFRA individual permit.

board of each county where the site is located, and (5) the local soil conservation district. N.J.A.C. 7:7-24.4(b) requires notice of the public comment period for the CAFRA individual permit be sent to (1) the municipal clerk in every municipality where the project is located, (2) the environmental commission, or another agency with similar responsibilities where the site is located, and (3) the planning board of each municipality where the site is located. Additionally, both N.J.A.C. 7:7-24.3 and -24.4 require notice—of the application itself and the public comment period for a CAFRA permit, respectively—be sent to "[a]ll owners of real property, including easements, located within 200 feet of the property boundary of the site <u>in the manner set forth in the Municipal Land Use Law</u> [(MLUL)] at N.J.S.A. 40:55D-12(b)." N.J.A.C. 7:7-24.3(b)(6); N.J.A.C. 7:7-24.4(b)(4). (Emphasis added).

Under the MLUL, "[n]otice shall be given by: (1) serving a copy thereof on the property owner as shown on the said current tax duplicate, or his agent in charge of the property, or (2) mailing a copy thereof by certified mail to the property owner at his address as shown on the said current tax duplicate." N.J.S.A. 40:55D-12(b). The property owners entitled to notice are those determined by the municipality where the site is located. <u>See</u> N.J.A.C. 7:7-24.3(b)(6); N.J.A.C. 7:7-24.4(b)(4) ("The owners of real property, including easements, shall be those on a list that was

14                                                                              A-4483-17T2

certified by the municipality."). Applicants are also required to publish newspaper notice. N.J.A.C. 7:7-24.4(a).

N.J.A.C. 7:7-24.3(d) and -24.4(d) require the public notice to include "a brief description of the proposed project," a site plan with the location, boundaries, and a depiction of the proposed development in relation to existing site conditions, and a copy of the form notice letter available from the DEP's website.

Although the CZM rules leave "property boundary of the site" under N.J.A.C. 7:7-24.3(b)(6) and -24.4(b)(4) undefined, "site" is defined as "the lot or lots upon which a proposed development is to be constructed." N.J.A.C. 7:7-1.5. Additionally, the CZM rules, adopting a definition from CAFRA,[7] define a "development" as "the construction, relocation, or enlargement of the footprint of development of any building or structure and all site preparation therefor, the grading, excavation, or filling on beaches and dunes, and shall include residential development, commercial development, industrial development, and public development." Ibid.

---

[7] Under CAFRA, a "development" is defined as "the construction, relocation, or enlargement of any building or structure and all site preparation therefor, the grading, excavation or filling on beaches or dunes, and shall include residential development, commercial development, industrial development, and public development." N.J.S.A. 13:19-3.

A-4483-17T2

With these controlling principles in mind, we turn to the subject notice. OSBCA's notice advised "neighboring landowners" about the application being submitted, described the proposed project, and advised that the complete application project was available for review at the "municipal clerk's office" or at the DEP's office. The description of the project stated the following:

> The site was previously developed with a residential bungalow community of [sixty-seven] units, commonly known as Camp Osborn. The entire residential development was destroyed by flood and fire during Superstorm Sandy on October 29, 2012. The site has been cleared of all debris created by the [s]uperstorm and is currently a vacant lot with no structural improvements. The applicant proposes the redevelopment of the property with [sixty-seven] residential units ([sixty-four] duplex and [three] single-family units) and associated access roads, as well as timber dune walkovers to provide access to the beach for the condominium association members and public. The residential units will contain a maximum of three bedrooms each, as determined by the individual unit owners.

OSBCA published a similar notice in a local newspaper that also advised how comments or a request for a public hearing could be submitted to the DEP.

JSTAR primarily argues that the notice was deficient because it failed to identify the east-west portion of Cummings Street as part of the project and for that reason did not meet the requirements for a description of the "development" as defined by the MLUL. Citing to Brower Development Corp. v. Planning Board

16

of the Township of Clinton, 255 N.J. Super. 262 (App. Div. 1992), JSTAR contends that a secondary roadway not contained in the lots slated for redevelopment must still be considered part of the "property" that is the subject of the development proposal. We disagree.

JSTAR's reliance on the MLUL for the content of the notice is inapposite. As noted, the CZM rules define the notice's content and only adopt the MLUL's provisions as they relate to how the notices must be served on the neighboring property owners. As to the notice's content, the CZM rules incorporate CAFRA's definition of "development," which limits the description to a brief explanation of the work to be performed on site. OSBCA never planned on performing any work on the existing east-west portion of Cummings Street, so there was no obligation for it to include anything about that portion of Cummings Street in its notice or to join RTS in the application, as also argued by JSTAR. OSBCA's notice disclosed that it planned to develop "access roads" and since it was not otherwise altering the existing portion of Cummings Street, it was not obligated to disclose anything more in its description.

We are not persuaded to conclude otherwise by JSTAR's reliance on Brower. That case is both factually and legally dissimilar. In Brower, a case decided under the MLUL, the developer-applicant reached an agreement with the abutting

landowners to construct on their property a proposed secondary access roadway to the developer's property. Brower Dev. Corp., 255 N.J. Super. at 264, 266. Here, there was no agreement with RTS and OSBCA did not propose to construct anything on RTS's property. There was no need for OSBCA to add anything more to the notice.

The Sufficiency of Scope of Service of Notice

Next, we consider JSTAR's challenge to the scope of OSBCA's notice to neighboring property owners. JSTAR argues that OSBCA's notice was also defective because the property list used to notify neighboring property owners did not include the owners of the properties within 200 feet of Lots 12 or 22 in Block 36. We find this contention to be without merit.

As to Lot 22, which is within 200 feet of OSBCA's proposed development site, as JSTAR admits, that lot is "located entirely along the beach and ocean front." For that reason, there are no property owners for that lot and any obligation to notify anyone with an interest in that lot was satisfied by OSBCA's sending notice to the adjoining property owners in Lots 13, 18, and 24. As to Lot 12, RTS's property, OSBCA never intended to develop Lot 12 and therefore the DEP never considered Lot 12 as part of OSBCA's application. OSBCA was under no obligation to notify

18

property owners within 200 feet of Lot 12 because OSBCA was never going to develop that property.

Public Comment Period

We turn our attention to JSTAR's argument that the manner in which the DEP conducted the public comment period violated its and the public's constitutional right to procedural due process of law. According to JSTAR, the DEP failed to adequately communicate with JSTAR and the other objectors or acknowledge their concerns during the public comment period. We disagree that the DEP was under any obligation to do more than it did in this case when considering the public's comments.

Procedural due process addresses whether there are sufficient procedural safeguards in place when the government deprives an individual of a particular interest. Rivkin v. Dover Twp. Rent Leveling Bd., 143 N.J. 352, 363-64 (1996). "The minimum requirements of due process . . . are notice and the opportunity to be heard." Jamgochian v. N.J. State Parole Bd., 196 N.J. 222, 240 (2008) (alteration in original) (quoting Doe v. Poritz, 142 N.J. 1, 106 (1995)).

CAFRA provides members of the public with an opportunity to express their comments and objections "orally or in writing," either at a hearing or through submissions made during a thirty day "comment period." N.J.S.A. 13:19-9. Where

there is no hearing, the DEP must give "sufficient public notice as to the commencement of the comment period." Ibid. Thereafter, within fifteen days after the comment period closes, the DEP "may require an applicant to submit any additional information necessary for the complete review of the application." Ibid. "[W]ithin [sixty] days after the hearing, if one is held, or within [sixty] days after the close of the comment period if no hearing is held," the DEP "shall approve, approve with conditions, or disapprove an application" for a permit. Ibid.; see also Spalt v. N.J. Dep't of Envtl. Prot., 237 N.J. Super. 206, 212 (App. Div. 1989).

Following CAFRA's requirements, the CZM rules provide for an opportunity for the public to be heard in response to an application for a permit. Under the CZM rules, applicants must await the completion of a public comment period. N.J.A.C. 7:7-26.4(a). Neither the CZM rules nor CAFRA dictate whether a hearing or a written submission is required. For that reason, we look to the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -31. See In re Issuance of Access Conforming Lot Permit No. A-17-N-N040-2007, 417 N.J. Super. 115, 127 (App. Div. 2010) (stating the APA governs when a statute has no provisions as to procedures an administrative agency must follow).

The APA specifically addresses the public's ability to respond to a permit application. According to the APA, "all interested persons are afforded reasonable

opportunity to submit data, views or arguments, orally or in writing, during any proceedings involving a permit decision." N.J.S.A. 52:14B-3.1(a). An "interested person," while not defined under the APA, is a property owner with an interest in a proposed development who stands to be "adversely affected." DEP Permit No. A-17-N-N040-2007, 417 N.J. Super. at 130. Written submissions during a public comment period "can provide an effective and efficient means for third-party objectors to voice their concerns with the State officials who will make the ultimate permitting decision." In re Riverview Dev., LLC, 411 N.J. Super. 409, 425 (App. Div. 2010).

Here, it is undisputed that the DEP provided JSTAR and the public with an opportunity to offer their comments about OSBCA's application and waited for their responses before deciding to approve OSBCA's application. The record demonstrates that after receiving those objections, the DEP considered the three objections and acted where appropriate, including having OSBCA change the material of the walkways as requested by OCC. Neither JSTAR nor any member of the public was deprived of an opportunity to bring to the DEP's attention data, views, and arguments that it felt should be considered in deciding whether to

grant the permit.[8]  See DEP Permit No. A-17-N-N040-2007, 417 N.J. Super. at 130.

JSTAR cites to no authority that required the DEP to contact it or any other objector

and respond to each objection.

As a thirty-day public comment period was held and because JSTAR was able

to submit its objections to the issuance of a CAFRA permit to OSBCA, JSTAR and

other members of the public were afforded due process.  See In re Riverview Dev.,

411 N.J. Super. at 425.

Sufficiency of Information to Support Issuing the Permit

Next, we consider JSTAR's contention that the "information and empirical

data" considered by the DEP was insufficient.  Specifically, JSTAR argues that (1)

the proposed roadways within the development were not designed one foot above

the flood hazard area design flood elevation; (2) OSBCA failed to amend its EIS

after the DEP made comments following completion of its engineering review; and

(3) OSBCA failed to comport with regulatory impervious coverage limits.

Relying on N.J.A.C. 7:7-9.25, JSTAR argues that OSBCA's proposed

roadways were not designed to be built to the correct flood elevation and OSBCA

---

[8]  Notably, some of JSTAR's objections were not responsive to OSBCA's application as they related to planning and zoning issues that would be considered by municipal and county boards charged with issuing developmental approvals, unrelated to CAFRA, under the MLUL.

failed to satisfy the requirements for an exemption from meeting the required elevation. We disagree.

Under the CZM rules, development in flood hazard areas must conform to the FHACA and its implementing rules at N.J.A.C. 7:13. See N.J.A.C. 7:7-9.25(f). Under N.J.A.C. 7:13-12.6(b)(1), the travel surface of a roadway must be "constructed at least one foot above the flood hazard area design flood elevation." An exemption from that requirement is permitted where the applicant demonstrates that it is "not feasible" to construct the roadway above the one-foot threshold. N.J.A.C. 7:13-12.6(b)(2).

In order to be exempt, an applicant must demonstrate the elevation requirements would result in one or more of the following:

> i. Prohibitively high construction costs;
>
> ii. Construction costs that are disproportionately high compared with any benefit that would be obtained by strict compliance;
>
> iii. A design that necessitates excessive volumes of fill that exceed the flood storage displacement limits at N.J.A.C. 7:13-11.4, for which flood storage cannot feasibly be created in compensation either onsite or offsite; or
>
> iv. A design that causes unavoidable and adverse impacts to the environment (such as to the channel, riparian zone, or fishery resources), or which would cause unavoidable and significant increases in flooding.

[N.J.A.C. 7:13-12.6(e).]

Here, OSBCA sought an exemption and made an initial submission demonstrating that it was not feasible to construct the roads to a height that would meet the required elevation. In response to the initial submission, the DEP required OSBCA to submit additional documentation to support its entitlement to an exemption. In response, OSBCA produced an addendum in which it relied upon N.J.A.C. 7:13-12.6(e)(ii), stating that "[i]t [was] impossible to situate the entirety of each proposed roadway or parking area at least one foot above the flood hazard area design flood elevation" because of the roadways' relationship to the abutting Route 35, "which is the only road leading to and from the site and is the evacuation route off the barrier island." Because Route 35 has an elevation of five feet, and it is the only access point to get out of the development site and off the island itself, in the event of a flood, Route 35 would be inundated if OSBCA's roadways were raised above Route 35's elevation.

After considering the information supplied by OSBCA, the DEP determined that it satisfied N.J.A.C. 7:13-12.6(e)(1)(ii). The DEP's engineering report stated OSBCA "satisfactorily demonstrated in the compliance statement, in accordance with N.J.A.C. 7:13-12.6, that it is not feasible to elevate the travel surfaces of the

24

proposed driveways, access ways and internal roads at least one foot above the regulatory flood hazard elevation."

In its arguments challenging the DEP's determination, JSTAR fails to properly address OSBCA's Route 35 flooding concerns. Instead, JSTAR argues that changing the layout of the development would remove the need for Cummings Street access, but JSTAR never mentions Cummings Street in relation to the flood hazard elevation regulations. JSTAR also fails to address Route 35, its propensity to flood given its elevation, and how OSBCA could not raise Route 35 to prevent any flooding because Route 35 is a public highway. JSTAR's solution is simply to redesign the development itself. We find no merit to its contentions.

Applying our discretionary standard of review, we conclude that the DEP properly exercised its discretion by granting OSBCA an exemption based on the negative impact that adhering to the flood elevation requirements would have on Route 35. Under these conditions, the DEP's granting OSBCA an exemption under N.J.A.C. 7:13-12.6(e)(ii) was supported by sufficient evidence in the record.

JSTAR also contends that OSBCA failed to properly amend its EIS by not incorporating required changes requested by the DEP's engineering comments, two,

three, and six, which related to the flood hazard area elevation for zone AO,[9] the minimum elevation of the finished floors of the dwellings for each flood zone as well as the flood hazard elevation for each flood zone, and a note about how a foyer with a floor that is not one foot above the flood hazard elevation is not permitted. We find JSTAR's contention to be without merit as it is belied by the record. OSBCA incorporated into its grading plans the DEP's engineering comments, so that its proposed dwellings complied with the FHACA regulations concerning flood elevations and minimum finished floor elevations.

The elevations of the units are governed by the FHACA regulations that state the DEP will only issue an individual permit to construct a new dwelling if "[t]he lowest floor of a single-family home or duplex is set at least one foot above the flood hazard area design flood elevation." N.J.A.C. 7:13-12.5(i)(1). In the DEP's second engineering comment addressing these regulations, it noted that the flood hazard area elevation for Zone AO was calculated at thirteen and a half feet. Engineering comment three required the removal of a note from OSBCA's plans about the exact finished floor elevations, as those had not yet been determined, and it required the

---

[9] Engineering comment two specified that "[t]he flood hazard area elevation within this zone is the highest grade within the location of the proposed project plus [three feet]."

minimum finished floor elevations be stated for each applicable flood zone. The third comment further stated that for flood zone AE8,[10] the minimum finished floor should be nine feet and for flood zone AO, the minimum finished floor should be at fourteen and a half feet. Engineering comment six simply required OSBCA to amend its submission by adding a note on the plan stating "a foyer with a floor that is not one foot above the flood hazard area is not permitted."

After receiving these comments, OSBCA concluded that for an AE zone, where the flood hazard elevation is eight feet, the finished floors must be nine feet or higher and for an AO zone, finished floors needed to be set one foot above the flood hazard elevation. OSBCA's grading plan showed that the lowest finished floor elevation (FFE) in the AE zone units was at least 14.39 feet, with the highest being 15.45 feet. These levels were much greater than nine feet, far exceeding the eight-foot flood elevation that the engineering comments required. As for the AO zone, OSBCA's grading plan shows the FFE ranges from 15.10 feet at its lowest point to 18.22 feet at its highest point. Engineering comment three stated the AO zone's minimum FFE needed to be 14.5 feet. OSBCA's grades for that zone were all greater

---

[10] According to FEMA, Zone AE includes "[a]reas subject to inundation by the [one]-percent-annual-chance flood event determined by detailed methods." Zone AE and A1-30, FEMA, https://www.fema.gov/zone-ae-and-a1-30# (last updated March 27, 2018). The eight indicates the elevation, determined by a Letter of Map Revision from FEMA obtained May 30, 2017.

A-4483-17T2

than 14.5 feet requirement. As such, the DEP's satisfaction with OSBCA's submission was also well supported by the record.

JSTAR also argues that OSBCA failed to comply with N.J.A.C. 7:7-13.17, which sets forth the impervious coverage limits for a site in a CAFRA area. JSTAR contends there were no quantifiable proofs submitted to prove that OSBCA ever complied with the impervious cover limits. We disagree.

According to the CZM regulations, "[i]mpervious cover limits . . . are important to reduce the negative impacts of development in coastal areas." N.J.A.C. 7:7-13.1(k). "Impervious cover" is defined as "any structure, surface, or improvement that reduces and/or prevents absorption of stormwater into land. Porous paving, paver blocks, gravel, crushed stone, crushed shell, elevated structures (including boardwalks), and other similar structures, surfaces, or improvements are considered impervious cover. Grass, lawns, or any other vegetation are not considered impervious cover." N.J.A.C. 7:7-1.5.

Calculations for impervious coverage limits vary depending on the location of the development site. See N.J.A.C. 7:7-13.17(a). When the site is not located in a CAFRA center, CAFRA core, or CAFRA node, the location of the site is

determined by referencing "Appendix H." N.J.A.C. 7:7-13.17(b)(2).[11] When the site is located in a coastal center, the impervious cover limit is determined by taking the "acreage of the net land area on the site as determined under N.J.A.C. 7:7-13.3(e)" and multiplying it by "the impervious cover percentage in Table H[12] . . . for the type of coastal center in which the site is located." N.J.A.C. 7:7-13.17(d)(1). The acreage of the net land area on a given site is determined by taking the sum of all the "special water's edge areas" on the site and subtracting that number from the acreage of the total land area on the site. N.J.A.C. 7:7-13.3(e). "Special water's edge areas" for purposes of computing the acreage of net land area are dunes, beaches, wetlands, wetland buffers, coastal bluffs, and intermittent stream corridors. N.J.A.C. 7:7-13.3(e)(2)(i) to (vii).

According to Appendix H, OSBCA's development is part of the South Mantoloking coastal village. Under Table H, a site located in a coastal village is limited to sixty percent of the net land area for impervious cover.

---

[11] CAFRA centers, cores, and nodes are delineated on the CAFRA Planning Map, available on the DEP's Geographic Information System (GIS). N.J.A.C. 7:7-13.17(b)(1); N.J.A.C. 7:7-13.16(f). OSBCA's site is not located within a CAFRA center, core, or node.

[12] Appendix H and Table H are different. Appendix H is used to determine the location of the site. Table H, incorporated into N.J.A.C. 7:7-13.17, provides the maximum coverage limits for a given site location.

OSBCA reported that the total land area for its development site was 3.49 acres. The "special water's edge areas" located on OSBCA's development site are the sand dunes, totaling .60 acres. Subtracting the dune acreage from the total land acreage yields a net land area of 2.89 acres. Since the maximum amount of impervious cover that a coastal village can have is sixty percent of the net land area, OSBCA's development site could only have 1.734 acres of impervious cover.

OSBCA proposed that its development site would have 1.7 acres of impervious cover. 1.7 acres out of 2.89 acres in net land area is approximately fifty-nine percent of the net land area. Therefore, OSBCA's proposed impervious cover was within the required limits under the CZM rules.

JSTAR's arguments to the contrary are unsupported by the record and based on its misinterpretation of the regulations. First, JSTAR contends that neither OSBCA nor the DEP provided any calculations to substantiate their claims that the acreage calculations are accurate. However, OSBCA's Preliminary and Final Major Site Plan's title sheet includes the impervious coverage calculations for the building coverage, the road coverage, and the dune walkover coverage. Second, in support of its contention, JSTAR cites the wrong standard for impervious cover limits. OSBCA's development site is located within a coastal village and not a CAFRA center, CAFRA core or CAFRA node as JSTAR contends. Given the location of the

development site, and the calculations based on that location, the DEP's decision that OSBCA was sufficiently within the impervious cover limit was not arbitrary, capricious, or unreasonable.

OSBCA's Prohibition from Seeking Modification

Last, JSTAR argues that under N.J.A.C. 7:7-27.5, OSBCA is precluded from filing a modification of its individual permit and therefore is required to file an entirely new application because of its failure to include the east-west portion of Cummings Street as part of its public notice. We conclude that this argument is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(D). Suffice it to say OSBCA never sought a modification and whether it can seek one in the future, if necessary, is not an issue ripe for our consideration. See K. Hovnanian Cos. of N. Cent. Jersey, Inc. v. N.J. Dep't of Envtl. Prot., 379 N.J. Super. 1, 10 (App. Div. 2005).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4483-17T2